**STATE et al. v. MALONE.**

No. 9334.

Court of Civil Appeals of Texas. Austin.

Jan. 20, 1943.

Rehearing Denied Feb. 3, 1943.

Gerald C. Mann, Atty. Gen., Geo. W. Barcus, Eugene N. Catlett, Ocie Speer, Richard H. Cocke, Asst. Attys. Gen., and Douglas E. Bergman, of Austin, for appellants.

Armstrong & Jaffe, of El Paso, and Dan Moody, of Austin, for appellee.

**McCLENDON, Chief Justice.**

Suit by Malone against the State and the Highway Commission for compensatory damages for destruction of growing cotton and permanent injury to the soil on Malone's irrigated farm in El Paso County, allegedly caused by the construction and maintenance of State Highway No. 1 (National Highway No. 80) in such manner as to impound upon the farm flood waters from heavy rains in June, 1930, and August, 1931. The suit was brought under legislative permission and liability was predicated upon Art. 1, Sec. 17 of the State Constitution, Vernon's Ann.St., providing that "No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person." The judgment was in favor of Malone upon a special issue verdict, and the State and Commission have appealed.

The points upon which the appeal is predicated may be epitomized as follows:

1. The acts complained of occurred in 1920, at which time "there was no State Highway Commission," were performed by no agency of the State, and the State was not liable therefor.

2. The action was one sounding in tort, for which the State was not liable.

3. Malone did not own the land when the highway was constructed (1920), and therefore he could not recover.

4. The evidence of extent of injury was of too uncertain a character to meet the legal test of probative value.

5. The evidence showed conclusively that there were other causes, including acts of Malone, contributing to the injuries.

6. The court improperly defined "unprecedented rain."

· Preliminary to a consideration of these points, we make the following general statement:

The State Highway Commission was created in 1917 by Chap. 190, p. 416, Acts Reg.Sess. 35th Leg., Vernon's Ann.Civ.St. art. 6663 et seq. The following provisions of the Act will suffice for our present purposes:

It created "the State Highway Department, the administrative control of which shall be vested in the members of the State Highway Commission and the State Highway Engineer hereinafter provided for." (Sec. 1.) "The Commission shall formulate plans and policies for the location, construction and maintenance, in cooperation with the counties of the State, or under the direct supervision and control of the State Highway Department, of a comprehensive system of State Highways and public roads." (Sec. 3.) The Department was charged with the duty of collecting information and compiling statistics "relative to the mileage, character and condition of the public roads in the different counties of the State, and the cost of construction of the different classes of roads in the various counties. It shall investigate and determine the methods of

road construction best adapted to the different sections of the State, and shall establish standards for the construction and maintenance of highways, bridges and ferries, giving due regard to all natural conditions, and to the character and adaptability of road building material in the different counties." (Sec. 7.) The department was given power to require or make intercounty road connections. (Sec. 10.) The Engineer was required (under commission direction and control) to prepare "a comprehensive plan providing a system of State highways, and it shall be the duty of the commission to advance the construction of such State highways in co-operation with the counties of the State, or under the direction, supervision and control of the State Highway Department, as the necessary funds for construction may be available." (Sec. 11.) State aid, not to exceed one-half the cost of construction, was provided for, and all parts of the system receiving such aid must be maintained at the expense of the county "in accordance with plans approved by the State Highway Department, and failure to maintain such Sections of State highway, shall forfeit any further State aid until such maintenance work shall have been done." (Sec. 12.) Funds apportioned to the State by the Federal Government were to be expended by the Department "only upon a part of the system of State Highways." (Sec. 15.) Funds were provided for construction and maintenance of highways through license taxes of motor vehicles, one-half of which was allocated to the counties which latter was constituted a special fund to be used only "in the maintenance of the public roads of such counties in accordance with plans approved by the State Highway Department." (Sec. 23.) The emergency clause recited: "The imperative need of measures calculated to secure greater efficiency and durability in public road construction and greater economy in the expenditure of the large sums of public funds annually employed in road work, and the fact that Texas has no Highway Department vested with power to encourage and direct the development of a system of State Highways, creates an emergency * * *." (Sec. 28.)

The work done on the highway was under a contract between El Paso County and a construction company. The plans for this work had been approved by the Highway Engineer, and the commissioners' court approved the contract subject to approval of the Highway Commission. The legislative resolution authorizing the suit recited that "said highway was then under the control and supervision of the State Highway Department, said highway being known and designated at that time as a State highway." The contract was dated October 26, 1920, and provided for completion not later than March 31, 1921. It was on a printed form headed: "State Highway Department. Contract." The job was "to grade roadbed and construct culverts" and was designated "Job No. 72–B–S.A.P. 108," meaning "State Aid Project No. 108." It contained a clause with reference to the employment of labor in accordance with the Federal Aid Act, 40 Stat. 1201, § 6. The work was to begin "at Station 12 near Fabens and extend thence to Station 677 91.4 or as far as the money available will construct in accordance with provisions of the State Statutes and of the notice to contractors, specifications, proposal and plans marked————annexed hereto, and made a part hereof." It was approved by the State Highway Engineer November 12, 1920. At the time the contract was made the road constituting the highway occupied an old abandoned dump constructed by the T. & P. Ry. This dump extended in a southeasterly direction on a slightly down grade along the south or southwest line of the farm in question. The G. H. & H. Railroad was immediately to the north of the dump, and paralleled it from the N. W. corner of the farm to a point near its eastern boundary where the railroad curved to the east and passed through a cut some 15 feet deep onto an arid plain of higher elevation. An arc-shaped escarpment about 15 feet high extended from a point on the N. W. line of the farm some 600 yards from its N. W. corner to the point where the railroad curved eastward. Two large arroyos cut through this escarpment and afforded natural drainage of storm waters from the plain at the N. W., N. and N. E. The farm land was situated between the escarpment and the railroad; and waters from these arroyos, under natural conditions, would "fan out" over the farm land and eventually pass off through four culverts, one near the N. W. corner of the farm, another near the eastward curve of the railroad, and the two others in between. The drainage according to the

natural lay of the land was from the escarpment southeasterly to the railroad. Prior to the work under the above contract, there were culverts in the highway corresponding in dimension and location to those in the railroad. The work done under the contract consisted in removing the culverts, constructing none in their stead, raising the grade of the highway to a point higher than portions of the farm, and paving the highway. The effect of this work was to eliminate all drainage from the watershed to the N. W. below the level of the highway crown. All the land to the south of this escarpment was within the Rio Grande Valley (the river flowing at this point a few miles to the south), and within an irrigation project supplied by a canal which left the river at or near El Paso and flowed, at this point, just below and parallel with the highway. In 1921 only about 20 acres of the farm was in cultivation. Malone bought the farm in 1927. All the land in this section of the State, both below and above the escarpment, was semi-desert, sandy loam, covered with a scrubby growth of mesquite and desert vegetation, the surface being made irregular by low sand dunes. The mean annual rainfall in this section was about ten inches, the rains coming usually in the summer months. These rains were usually not general but consisted of local heavy showers or cloudbursts. On account of the light rainfall none of the land was suited to cultivation except under irrigation. After 1927 Malone increased his cultivated acreage to about 200. A lateral irrigation ditch was constructed from the canal entering his land through openings under the highway and railroad at his N. W. corner. It paralleled his N. W. line to a point near the foot of the escarpment, thence curved eastward following the foot of the escarpment to a point near the railroad eastward curve. The land between the ditch and the railroad was prepared for irrigation in the usual manner. This was done by grubbing and otherwise clearing it of vegetation, and leveling it off. On the outside of this irrigation ditch Malone constructed a drainage ditch to prevent flood waters coming down the arroyos from flowing on the cultivated land. This ditch diverted the waters from the farm land and conducted it to the railroad on either side. The general natural lay of the land, however, was not disturbed, and no water was diverted into the watershed drained by the railroad culverts than would otherwise have been so drained. The two floods of June, 1930, and August, 1931, were caused by local rains of from 1 to 1½ inches falling in a very short time—about an hour. The effect was to impound the water to near the height of the highway and flood a large portion of the farm. There being no escape for the water except by evaporation and seepage the inundation lasted some four to six weeks. Portions of the cotton crop were destroyed, and the land was permanently injured by waterlogging and deposits of alkali brought up from the sub-surface water. Shortly after the 1931 flood drains were constructed in the highway which adequately took care of the waters of other floods of equal or greater volume than those of 1930 and 1931, and no damage was thereby occasioned.

■ The above statement is taken from the evidence viewed most favorably to Malone, and does not take into account conflicts therein, since the latter do not concern this appeal.

Appellants' first point, that the State was not liable because the acts complained of were not those of the State nor of an authorized agency of the State, seems to be predicated upon the hypotheses that (1) there was at that time existent no agency authorized to bind the State in the construction and maintenance of highways; and (2) the contract for the work was with El Paso County, and the county alone was liable for any injury thereby occasioned.

■■ The public road constituting the highway had no doubt been in existence many years. In what manner the right of way was acquired does not appear from the record. But at what time or in whatever manner it was acquired the ownership was in the State. This question is fully discussed with citation and analysis of authorities in Robbins v. Limestone County, 114 Tex. 345, 268 S.W. 915. We deem it necessary only to state the holding in that case which is embodied in the following quotations from the syllabus:

"Public roads belong to the State and not to the counties. While the title thereto was taken, under statutory authority, in the name of the counties and they were

charged with construction and maintenance within their boundaries, this was for the benefit of the State and its people.

"The establishment of public highways being primarily a function of government belonging to the State, the Legislature may exercise possession and control of them through such agencies as it may designate, in the absence of constitutional restrictions."

We are not here concerned with the liability vel non of the State for acts of the county in this regard performed prior to or independently of the above Act of 1917, creating the State Highway Department and Highway Commission. The record shows that this was a state aid project, performed under contract approved by the State Engineer on a printed form of the Highway Department. The Act required, as a prerequisite to allotment of state aid, that "such roads shall be · constructed according to specifications and under the supervision of the highway engineer." While the counties were charged with the maintenance it was required to be "in accordance with plans approved by the State Highway Department," and failure to so maintain was penalized by forfeiture of state aid "until such maintenance work shall have been done."

 We think it is clear that the construction of any portion of a highway as a state aid project constituted a complete assumption by the State of the construction and maintenance thereof. Whatever duties in relation to such construction and maintenance were imposed by the Act on the county were so imposed in furtherance of that assumption. The county acted in that matter as agent of the State, and its acts were the acts of the State to the extent in any event that they were done with the approval and under the supervision of the Highway Engineer. There is no intimation in the record that they were not so done, and they will be presumed to have been so done, absent showing to the contrary. We hold that the liability of the State is the same as it would be had the work been done under contract direct with the Highway Department with legislative sanction.

Appellants' second point that the action is one sounding in tort is predicated upon the assumption that the State owes to landowners the same duty that is imposed upon railroads by statute to provide, in the construction of their roadbeds, the necessary drainage facilities in accordance with the natural lay of the land; and that a failure to discharge that duty constitutes negligence. The pleadings and evidence show (it is asserted) that this duty was not performed, and that the asserted injuries resulted from such nonperformance, from which it follows conclusively that the State is not liable. If this contention embodied a correct statement of law, there could be no liability on the part of the State for flooding one's land by highway construction, because the asserted duty must necessarily be an absolute one, and its nonperformance an act of negligence as a matter of law. That this asserted principle of law is not a correct one is ruled by the case of State v. Hale, Tex.Civ.App., 96 S. W.2d 135, affirmed as to this point in 136 Tex. 29, 146 S.W.2d 731. We would rest our decision upon the bare citation of this authority, but for appellants' earnest insistence that the Supreme Court decision in the Hale case supports their contention.

 This exact question was raised in the Hale case; and it was there held that the liability of the State was not predicated upon a tortious act, nor upon any breach of duty which it owed the landowner (other than the duty imposed by the constitution to make "adequate compensation" for property "taken, damaged or destroyed for or applied to public use"). The damage here complained of was clearly for a public use. The construction and maintenance of the highway were acts of the State, performed by its authorized instrumentalities. The State manifestly could not construct or maintain highways except through its agents. To those agents is delegated the manner in which such construction and maintenance are to be performed. This necessarily confers a wide discretion involving skill and judgment in both engineering and financing. Where, as here, the liability of the State is predicated upon acts of its agents in the performance of their duly delegated discretionary duties, whether there were errors or mistakes of judgment in the performance of those acts are not matters of judicial inquiry. We refer in this connection (without quotation) to paragraphs. [9] and [10], page 139, col. 2 of our opinion in the Hale case in 96 S.W.2d. If a case should ever arise in which "acts of the highway commission in carrying out the legislative mandate" were "so arbitrary and unreason-

able as to amount to an abuse of its authority, and an unwarranted use of its delegated powers," it would certainly be incumbent upon the State in repudiating those acts on that account to establish them affirmatively by both pleading and proof.

Appellants rely strongly, in this regard, upon the phrases which they have italicized in the following quotations from the Supreme Court's opinion in the Hale case [136 Tex. 29, 146 S.W.2d 737]:

"The liability of the State under Section 17 of Article 1, supra, for taking, damaging, or destroying private property for public use, where the authority is *properly exercised,* should not be confused with the claim for damages caused by the negligent acts or wrongs committed by its agents or officers. * * *

"It [the Highway Commission] has the right, as the agent of the State, to take, damage, or destroy private property for public use. This right has been guaranteed by our Constitution. Public roads are a great public convenience, and, *if necessary to carry out plans for the completion of a public road,* private property may be totally or partially taken or damaged to accomplish that purpose. This carries with it the power, *if need be,* that a servitude may be created on land not actually taken or occupied by the public highway, for the purpose of carrying off the water, the natural flow of which is changed or diverted by the construction of such highway."

■ It must be borne in mind that this language was used in considering the exact question now before us in connection with an exact factual situation, the construction of a highway without providing sufficient drainage facilities. So considered, it can not be construed as to preclude liability of the State where the commission has failed to provide such drainage facilities.

The precise question which appellants seek to raise under point three is not entirely clear to us. We therefore quote in full the point and its treatment in appellants' brief (omitting transcript references):

"Point Three: The error of the court in rendering judgment for the plaintiff for damages to his land because of the construction of the highway complained of, since, indisputably the plaintiff did not own such land at the time such highway was constructed.

"The above point is here made, because, as we have seen in the arguments under the preceding Points One and Two, the case was pleaded and submitted upon the theory that the State had constructed the road involved, which, as has further been shown, is indisputably refuted.

"The case having been tried upon a false theory and an adverse judgment suffered by the defendant, it cannot be said that the error is harmless, and that the jury was not misled thereby, especially in view of the fact, which is undisputed, that plaintiff did not own the property involved at the time of the construction of the road, but acquired it long thereafter, towit, in 1927."

The assertion that "the theory that the State had constructed the road * * * is indisputably refuted," is fully considered under point one, above.

■ Malone's brief treats this point as asserting in effect the proposition that the cause of action arising from construction of the highway arose when the construction was completed and did not pass to Malone as an incident to his subsequently acquired title to the land. The highway was constructed upon the right of way owned by the State and there was no invasion of any portion of the land which Malone subsequently acquired. The rule is well established in this State that the cause of action for damages so occasioned accrued when the injury occurred and to the then owner. Austin & N. W. R. Co. v. Anderson, 79 Tex. 427, 15 S.W. 484, 23 Am.St.Rep. 350; Clark v. Dyer, 81 Tex. 339, 16 S.W. 1061; Parsons v. Uvalde E. L. Co., 106 Tex. 212, 163 S.W. 1, L.R.A. 1916E, 960; St. Louis S. W. R. Co. v. Clayton, 54 Tex.Civ.App. 512, 118 S.W. 248, error refused; 35 Tex.Jur., p. 191, § 125.

We gather from their supplemental brief that appellants seek to urge substantially the following ground in support of this point:

The injury recovered for arose from "maintenance" (for which the State was not liable) and not from "construction" of the highway. It is urged in this connection that the liability of railroads in this regard arises by virtue of the statute (Art. 6328) which imposes the duty not only to "construct" but to "maintain", etc. The statute does not expressly require anything but "construction". It does impose

a duty and the courts have held that this is a continuing one and includes "maintenance". The State's liability, as we have seen, is predicated—not upon dereliction of duty—but upon the constitutional mandate to make "adequate compensation" for "injury" to "private property" for "public use." The property right here involved was that inherent in the landowner to have the waters from these arroyos pass off his land through the natural channels. Infringement of this right by lawful act of the State would impose liability for any consequential injury. It would seem unimportant whether the injury arose from "construction" or "maintenance", so long as the act from which it arose was that of the State. We are not here concerned with injuries arising from failure to keep in repair, such as keeping drainage facilities free from obstruction. The "maintenance" here, in so far as that term may have any application, consisted in making no change in the original construction as regards drainage facilities.

Appellants' points fourth and fifth will be considered together. They are predicated upon the assertion that the evidence shows conclusively that the damages proved were the result, at least in part, of causes other than the construction of the highway, and that there was no basis in the evidence for a segregation of the amount of these damages from those caused by the highway construction. These contributing causes consisted in putting the land in condition for irrigation, and drawing the alkali from the subsoil as a result of flooding the land with irrigation water. We are asked to take judicial knowledge of this latter phenomenon, no evidence being introduced to support it.

The evidence will abundantly support the conclusion that the highway construction was the sole proximate cause of the injuries. We briefly summarize it:

The farm land was protected by the drainage ditch outside the irrigation ditch and none of the flood waters flowed directly upon the farm land. The inundation was caused solely by the damming up of the flood waters by the highway embankment. In addition to direct evidence to this effect, it was shown that after the openings were placed in the highway following the August, 1931, flood there were other floods of equal or greater volume than those in issue, and that these flood waters were disposed of by these openings and no inundation or damage resulted.

As to putting the land in irrigable condition: this consisted, in addition to its clearing and leveling, in constructing borders about one foot in height to retain the irrigation water until it was absorbed by the land; the contention being that these borders would have retained the flood waters on the land even had there been no highway there. The evidence shows, to the contrary, that (1) the farm land would not have been flooded at all, absent the highway, since the flood waters would not have flowed on the land, and (2) the water that would have been retained by the borders, if in fact sufficient to produce injury, could readily have been drained off by cutting the borders. It is manifest that no drainage of the land inside the borders could be effected until the level of the impounded water dropped below that of the border-enclosed land.

We may assume that water from irrigation, if in sufficient volume, will have the same effect as flood waters in drawing up the alkali from the subsoil. But the evidence negatives damage from that source. The land was included in a large irrigation project extending many miles below El Paso in the Rio Grande Valley. That the entire project was conducted scientifically with reference to known impediments may be assumed even in the absence of affirmative proof. But the proof affirmatively shows that this particular source of injury to the land had been guarded against by means of subsoil tiling which carried off any excess of irrigation water which might tend to water-log the land or raise the water table. If, with this precaution, the necessary effect of applying the proper amount of irrigation water to the land under approved methods, would be to bring the subsoil alkali to the surface and thus destroy the land for farming purposes, the whole irrigation project would no doubt prove a failure after a few years of operation. We cannot take judicial knowledge of such consequences; and they are negatived by the plaintiff's evidence, which was not refuted.

Appellants also contend that the State's liability extends only to injuries to the land in its condition when the highway was constructed, and it cannot be held responsible for injuries to land that

was put in condition for irrigation long after such construction. There is no merit in this contention. The use of land for lawful purposes is not only a right which every landowner possesses, but where such use· is for agricultural purposes it contributes to the economic well-being of the State and is universally recognized as a public benefit. As regards irrigation in the arid regions of the State, this benefit is recognized in the constitution and laws of this State. See 44 Tex.Jur., pp. 339, 340, § 221, and supporting authorities. Where the injury to the land is the result of invasion of the property right to drainage from overflow, the right of recovery extends to detriment to any reasonable lawful use to which the land at the time may be devoted, regardless of the time when the land was put in condition for such use.

As to appellants' point six: The court's definition complained of reads: "By the term 'unprecedented rain' as used in this charge is meant such an unusual and extraordinary rainfall as has no example or parallel in the history of rainfall in the general vicinity affected, or as affords no reasonable warrant or expectation that it will likely occur again, and so could not reasonably be expected, even at long intervals."

The objection leveled at this definition was that it is "too restrictive against defendant, in that it requires the same to be without 'example or parallel', whereas a rain is unprecedented when it could not have been reasonably anticipated or reasonably to be expected."

In connection with this objection appellants tendered the following definition, which was refused: "By the term 'unprecedented rainfall' as used in this charge is meant an unusual and extraordinary rainfall in the particular locality in question, affording no reasonable expectation that it would have likely occurred."

 The definition given embodies the correct definition, and that tendered does not. "Unprecedented" means "having no precedent or example; novel, new, unexampled." Webster's Int. Dict. "Unusual" and "extraordinary", on the other hand, presuppose other like occurrences, though rare or infrequent. The rule which the courts have applied in relation to floods is embodied in the following quotation from Gulf, C. & S. F. R. Co. v. Pomeroy, 67 Tex. 498, 3 S.W. 722, 724: "If, when the

work is being constructed, extraordinary inundations have occurred within the memory of men then living, their recurrence should be anticipated, and provision made against the danger likely to result from the works should a recurrence of the flood take place."

Furthermore, the evidence would not in our opinion support a finding that either of the floods complained of was unprecedented.

The trial court's judgment is affirmed.

Affirmed.