TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-07-00069-CV






The State of Texas, Appellant


v.


Lloyd S. McCarley et al., Appellee






FROM THE COUNTY COURT AT LAW NO. 4 OF WILLIAMSON COUNTY

NO. 03-0400-CC2-4, HONORABLE JOHN McMASTER, JUDGE PRESIDING



 

C O N C U R R I N G O P I N I O N

 

 I concur in the majority's decision to affirm the judgment of the county court, but
write separately in the interest of fully addressing the issues raised by the parties on appeal. 

 This appeal arises from a statutory condemnation action filed by the State of Texas
against Lloyd S. McCarley for a portion of his property needed for a highway project. The jury
awarded $371,000 to McCarley. In five issues, the State contends on appeal that (1) McCarley's
claim for damages was an inverse condemnation claim; (2) the trial court did not have subject matter
jurisdiction over the inverse condemnation claim because it was not ripe; (3) the State has sovereign
immunity because McCarley failed to plead and prove the requisite intent for an inverse
condemnation claim; (4) McCarley does not have a justiciable interest in the inverse condemnation
claim; and (5) there was no competent evidence or, in the alternative, insufficient evidence to support
the jury's award of $371,000 in damages. For the reasons that follow, I would affirm the county
court's judgment.


FACTUAL AND PROCEDURAL BACKGROUND

 In April 2004, the State brought a condemnation suit to acquire a "corner clip" of
McCarley's property located at the corner of Ranch Road 620 and Lyndhurst Street in Williamson
County. The State sought to acquire 836 square feet of land as part of its project to widen and
improve Ranch Road 620 to become State Highway 45. The project included elevating the highway
frontage road by several feet above existing grade on a solid retaining wall across McCarley's
property and elevating Lyndhurst for several hundred feet to meet the new, higher frontage road at
the former intersection with 620. The county court appointed a panel of special commissioners to
determine the amount of adequate compensation to be paid by the State. The commissioners
awarded McCarley $4,180 in damages. McCarley objected to the commissioners' award and
appealed to the county court.

 At the time of the condemnation, McCarley's property, consisting of two lots and
approximately 1.75 acres, was vacant. The lot that fronted 620 ("Lot 1") was zoned, in part, "GR,
retail," and the lot that fronted Lyndhurst ("Lot 2") was zoned "interim single family." (1) The City
of Austin had approved a site plan for the two lots in 1998, requiring the "unified development" of
the two lots for water quality and stormwater detention. The permitted use under the 1998 site plan
was retail for Lot 1 and office or warehouse for Lot 2. The 1998 site plan for the two lots expired
in 2001, and McCarley did not apply for additional site development permits prior to the
condemnation suit.

 Prior to trial, McCarley filed a "conditional counterclaim in inverse condemnation"
for "damages resulting from the drainage problems caused by [the State's] project." In response, the
State filed a plea to the jurisdiction and a motion to exclude McCarley's evidence. In the plea to the
jurisdiction, the State asserted that McCarley's counterclaim should be dismissed based on sovereign
immunity because he failed to plead the "intent" required for an inverse condemnation claim, that
there was a lack of ripeness because no flooding had occurred and no site plan had been denied, and
that McCarley lacked a justiciable interest because he no longer owned the property. In the motion
to exclude McCarley's evidence, the State sought exclusion on similar grounds to its plea to the
jurisdiction. The trial court denied both the plea and the motion, and the case proceeded to trial.

 At trial, McCarley called three experts, a land planner/development consultant, a civil
engineer/design consultant, and a real-estate appraiser. The land planner testified that he assisted
McCarley in the site planning process, starting in 1996 and continuing through the 1998 approval
of the site plan for the lots' development. He testified that the process took "about 16 months." He
also testified that McCarley contacted him after the site plan expired about resubmitting the site
plan for approval, but that resubmission was put on hold after McCarley learned of the State's
highway project.

 The engineer testified concerning the highway project's drainage system. He opined
that the system prevented McCarley's remainder property from being developed within the City of
Austin's requirements for stormwater management. The engineer testified that the City requires that
a property be designed to receive and address all stormwater from a 100-year storm event that would
flow to the property from the drainage basin upstream. It was the engineer's opinion that as a result
of the drainage system, stormwater would back up on the remaining property in a 100-year storm
event and the City of Austin would not grant a permit for any type of development for the remainder.

 McCarley's appraiser testified to the market values of the property before and after
the taking and the effect of the State's drainage system on the remainder's value. He recommended
compensation for the taking of $403,000. His recommendation was based in part on the engineer's
conclusions concerning the inability to develop the property after the taking because of the highway
project's drainage system. He testified that the highest and best use for Lot 1 at the time of the
taking was commercial or retail, and he placed a value on Lot 1 prior to the taking of $400,000. He
supported his value by analyzing comparable sales in the area. He testified that Lot 2's highest and
best use was "office/warehouse," and he placed a value of $75,000 on Lot 2 prior to the taking, also
based on comparable sales in the area. He concluded that the remainder value for both lots after the
taking was $72,000. He reached this conclusion by reducing the lots' value before the taking by 85%
due to the inability to develop the property in light of the highway project's drainage system. In
reaching the remainder's value, he compared "properties that had flooding problems and those that
didn't, and then compared how much the difference of prices were." He also arrived at a similar
value for the remainder using the income approach, "what a buyer would pay for a particular income
stream." Under this approach, he compared rents for commercial sites that were used for "outdoor
vendor sales" such as Christmas trees to arrive at a value for the remainder property.

 The State's witnesses were the engineer in charge of the highway project's
construction, a land planner/architect, and a real-estate appraiser. The engineer explained the design
and construction of the highway project's drainage system. The land planner/architect testified
concerning zoning for Lot 1, concluding that the "highest zoning" was "neighborhood office."
Relying in part on the State's other expert's conclusions, the appraiser recommended compensation
for the taking in the amount of $4,682, the market value of the 836 square feet. The appraiser did
not include any compensation for the remaining property as it was his opinion that the condemnation
of the 836 square feet did not reduce the remainder's value. His opinions were confined to Lot 1,
placing a value of approximately $240,000 on the lot immediately before and after the taking, and
that "neighborhood office development" was the highest and best use for the lot. He was aware of
McCarley's reports that the "drainage system would not work right," but his opinions assumed that
the property could "get a site development permit," and relied on the State's engineering report that
"the drainage worked just fine."

 The jury was given one question--the difference in market value of McCarley's
property immediately before the taking and the market value of the remaining property after the
taking, with definitions of "fair market value" and "highest and best use":

 

 On September 16, 2003, what was the difference between (a) the fair market value
of the landowner's whole property before the taking, excluding any consideration of
the condemnation or proposed project and (b) the fair market value of the remainder
only, after the taking, giving consideration to the uses to which the condemned part
is to be subjected.

 

 "Fair Market Value" means the price which the property would bring when
it is offered for sale by one who desires, but is not obliged to sell, and is bought by
one who is under no necessity of buying it, taking into consideration all of the uses
to which it is reasonably adaptable and for which it either is or in all reasonable
probability will become available within a reasonable future period. In making your
determination of Fair Market Value, you will consider the "Highest and Best Use"
of the land involved.


 "Highest and Best Use" means that legal use to which the property could have
been adapted on the date of taking, or within the reasonably foreseeable future
thereafter which was legally permissible, physically possible, financially feasible, and
provided the owner with the greatest net return. 

 

After the jury determined the difference in value to be $371,000, the county court credited the State's
prior deposit of the amount of the special commissioner's award against the jury's award and entered
judgment against the State. The State's appeal followed.


ANALYSIS

Standard of Review

 The State raises both legal and factual sufficiency issues as to the jury's award of
damages for the statutory partial taking of McCarley's property. "In determining whether a finding
is supported by legally sufficient evidence, we consider the evidence in the most favorable light, and
indulge every inference in its favor." Tarrant Reg'l Water Dist. v. Gragg, 151 S.W.3d 546, 552
(Tex. 2004). "If the record contains more than a scintilla of evidence that supports the finding, we
must sustain it." Id. Incompetent evidence is legally insufficient to support a judgment. City of
Keller v. Wilson, 168 S.W.3d 802, 812 (Tex. 2005).

 In reviewing the factual sufficiency of the evidence, we consider, weigh, and examine
all the evidence presented at trial, including any evidence contrary to the judgment. Plas-Tex, Inc.
v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989). We set aside a finding for factual
insufficiency if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong
and unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). With both legal and factual sufficiency
review, the starting point of analysis is the charge that was submitted to the jury absent complaint
on appeal. Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex. 2000); Golden Eagle Archery, Inc. v. Jackson,
116 S.W.3d 757, 762 (Tex. 2003).

 Whether damages for a taking are compensable under the constitution depends on the
type of damage involved, and compensability is a question of law for the court, subject to de novo
review. County of Bexar v. Santikos, 144 S.W.3d 455, 459 (Tex. 2004); Interstate Northborough
P'ship v. State, 66 S.W.3d 213, 220 (Tex. 2001).


Inverse Condemnation 

 The State asserts that McCarley's claim for damages due to his alleged injury from
the State's drainage system was an inverse condemnation claim and that such claim was not ripe for
determination during the statutory condemnation case because the highway project was still under
construction, no site development permit had been denied, and no flooding had occurred on the
remaining property. The State also argues that McCarley did not plead or prove the requisite intent
and that McCarley lacks a justiciable interest because he sold the property. The State contends that
although a claim concerning the drainage system may be actionable at some point in the future, the
claim can be brought only in inverse condemnation because it relates to the "anticipated effect of
drainage improvements being constructed by [the State] in its existing right-of-way, and does not
relate to the use of the 836 square feet being acquired." The State argues McCarley's claim is
inverse because the State did not seek as part of its statutory condemnation to inundate McCarley's
remainder with stormwater runoff from its drainage system. 

 "When the government takes private property without first paying for it, the owner
may recover damages for inverse condemnation." Gragg, 151 S.W.3d at 554. To recover on an
inverse condemnation claim, a plaintiff must plead and prove an intentional governmental action,
resulting in a taking, damage or destruction of property, for public use without process or a proper
condemnation proceeding. See Tex. Const. art. I, § 17; General Servs. Comm'n v. Little-Tex.
Insulation Co., 39 S.W.3d 591, 598 (Tex. 2001); City of Houston v. Texan Land & Cattle Co.,
138 S.W.3d 382, 387-88 (Tex. App.--Houston [14th Dist.] 2004, no pet.). 

 Although McCarley could have brought an inverse condemnation action had there
been no partial taking, a further proceeding was not appropriate or necessary in light of the already
pending condemnation proceeding. See Westgate, Ltd. v. State, 843 S.W.2d 448, 452 (Tex. 1992)
(inverse claim and statutory condemnation claim addressed in same proceeding); State v. Fiesta
Mart, Inc., 233 S.W.3d 50, 56-57 (Tex. App.--Houston [14th Dist.] 2007, no pet.) (court had subject
matter jurisdiction to hear both State's statutory condemnation claim and leaseholder's inverse
condemnation counterclaims for damage to personal property and business loss caused by impaired
access); Texan Land & Cattle Co., 138 S.W.3d at 386-88 (damages awarded for inverse claim for
blocking access to property prior to condemnation and statutory claim for fair market value
of property in same proceeding); City of Austin v. Casiraghi, 656 S.W.2d 576, 579-80
(Tex. App.--Austin 1983, no writ) (damages for loss of business brought in separate cause of action
for inverse condemnation not allowed because not plead in statutory condemnation action); cf. Dahl
v. State, 92 S.W.3d 856, 863 (Tex. App.--Houston [14th Dist.] 2002, no pet.) (inverse condemnation
claims "duplicative" of State's condemnation action do not comprise valid inverse claims).

 The trial court properly allowed McCarley as the landowner to recover all of the
damages to his property in a single action. See White v. Natural Gas Pipeline Co., 444 S.W.2d 298,
301 (Tex. 1969) (landowner "not to be burdened with the delay and expense of future lawsuits"); 
City of LaGrange v. Pieratt, 175 S.W.2d 243, 246 (Tex. 1943) (landowner must raise all reasonably
foreseeable claims in statutory condemnation proceeding); Casiraghi, 656 S.W.2d at 579 (property
owner given "single opportunity" to recover for the taking of property). (2) Because McCarley was
aware of the injury to his property from the drainage system, whether his claim was "inverse" or not,
he properly brought it in the statutory condemnation proceeding. See Spindor v. Lo-Vaca Gathering
Co., 529 S.W.2d 63, 65-66 (Tex. 1975) (recovery may be had in condemnation proceedings
for injuries to the remainder which are reasonably foreseeable at the time of condemnation); Pieratt,
175 S.W.2d at 246 (if reasonably foreseeable claims are not brought, they may be forever barred). 


 1. Was McCarley's claim ripe?

 The State argues that McCarley's claim concerning the State's drainage system was
not ripe because the highway project was still ongoing, there had been no flooding on his property,
and there had been no permit denial at the time of the statutory condemnation. In support of its
argument that McCarley's claim was not ripe because the highway project had not been completed,
the State cites Hubler v. City of Corpus Christi, 564 S.W.2d 816 (Tex. Civ. App.--Corpus Christi
1978, writ ref'd n.r.e.). In Hubler, the court dismissed the plaintiff's inverse condemnation claim
because the governmental drainage plan at issue was a series of projects and not all of the projects
were completed, and the plaintiff did not claim that his land's value had been decreased by the
completed projects but that the land value would be decreased at the conclusion of the series of
projects. Id. at 821-24. The court concluded that the plaintiff's evidence of a decrease in market
value was "too remote and speculative." Id. at 822. Unlike Hubler, there was evidence in this case
that the market value of McCarley's remainder had decreased at the time of the statutory
condemnation proceeding and that the decrease was caused by the substantially complete drainage
system. See id. at 822. (3) The drainage system's status of construction did not prevent McCarley's
claim from being ripe.

 The State cites State v. Malone, 168 S.W.2d 292, 298 (Tex. Civ. App.--Austin 1943,
writ ref'd w.o.m.), to support its position that McCarley's claim was not ripe because there had been
no flooding on his property. In Malone, the State constructed a highway entirely in its own right-of-way and did not acquire any portion of the plaintiff's land for the highway's construction. Id. at 294. 
The plaintiff purchased the land after the project was completed and sought damages to his crops and
soil when his property flooded as a result of the highway's construction. Id. at 298. Unlike the
landowner in Malone, McCarley did not seek damages to his property from flooding. McCarley
sought damages because the drainage system precluded his remaining property from being
developed. Given McCarley's claim was that he could not develop his property, actual flooding was
not required for McCarley's claim to be ripe. See Spindor, 529 S.W.2d at 65-66.

 The State also relies on Coble v. City of Mansfield, 134 S.W.3d 449, 458-59
(Tex. App.--Fort Worth 2004, no pet.), in support of its argument that McCarley's claim was not
ripe because no permit had been denied on McCarley's property. In Coble, the landowner was
denied damages for the estimated cost of compliance with a subdivision ordinance (the cost of
required improvements) as part of his remainder damages in a partial takings case. Id. at 451. The
court concluded that the landowner's inverse condemnation claim was not ripe because the city had
not made a final decision on the ordinance's applicability and the landowner had not shown that it
would have been futile to seek a final decision. Id. at 458-59. The court concluded that the damages
for the cost of compliance were "not reasonably foreseeable" but "remote, speculative, and
conjecture." Id. at 456. There was evidence that the ordinance might not be applicable and that,
even if it was, the landowner might be granted a variance so that the improvements would not be
required. Id. at 456-57.

 In contrast, the evidence as to McCarley's remaining land was that the State's
drainage system prevented the remainder property from being permitted for development under the
City's requirements. Unlike Coble, there was no evidence that the City's requirements might not
apply to McCarley's remaining land after the taking or that a variance might be granted. (4)
 On this
record, I would conclude that McCarley's claim was ripe for determination in the statutory
proceeding.


 2. Did McCarley establish the requisite intent? 

 The State also argues that the State has sovereign immunity from McCarley's claim
because McCarley failed to establish the requisite intent. The requisite intent for a takings claim is
present when the governmental entity knows that a specific act is causing identifiable harm or knows
that the harm is substantially certain to result from an authorized governmental action. See Gragg,
151 S.W.3d at 555; City of Dallas v. Jennings, 142 S.W.3d 310, 314 (Tex. 2004). McCarley
presented expert testimony that the loss in value in the remainder property was the result of the
State's drainage system "as intended." See Gragg, 151 S.W.3d at 555 (court draws distinction
between design and operation "as intended" and negligence). 

 There was evidence that the State designed the drainage system knowing that
stormwater would back up on McCarley's property. In addition to the evidence that the State
designed and constructed the drainage system for a 10-year storm event and the City of Austin
requires landowners to develop their land to accommodate a 100-year storm event, there was
evidence that the State designed and built a retaining wall to divert water flowing from McCarley's
property away from a nearby school. Although the engineer for the State testified that the wall that
was built at the school's property line was a "noise wall," the State's plans referred to it as a
"retaining wall." McCarley presented evidence that stormwater from his property would flow toward
the school's property, and that the wall at the school's property line was designed to function as a
retaining wall to divert water from McCarley's property from flowing on school property during
storm events. McCarley's evidence was sufficient to satisfy the requisite intent.


 3. Did McCarley have a justiciable interest in his claim?

 The State argues that because McCarley sold the remaining property in February
2006, he lacks a justiciable interest in his claim. But McCarley owned the property at the
determinative time, i.e., at the time of the taking. See City of Fort Worth v. Corbin, 504 S.W.2d 828,
830 (Tex. 1974). McCarley was required to present all of his claims for damages that were
reasonably foreseeable from the taking. See Pieratt, 175 S.W.2d at 246. He, therefore, properly
sought his accrued damages due to the drainage system's effect on his remaining property's value. 
McCarley had a justiciable interest in his claim arising from the drainage system.

 I would overrule the State's issues on inverse condemnation.


Statutory Condemnation Award

 The State does not contend on appeal that the question to the jury was an incorrect
statement of the law, but argues that there was no competent evidence or, alternatively, insufficient
evidence to support the jury's finding that the difference in value of the whole property before the
taking and the remaining property after the taking was $371,000. The State contends that the jury's
award was improper because evidence of the drainage system's effect on the remaining property's
value was incompetent evidence and, because it was the only evidence tendered by McCarley
supporting the remainder damages, there was no evidence to support the award. The State argues
that the determination of any decreased value should have been limited to the effect of McCarley's
loss of the "corner clip" and not the effect of the highway project's drainage system on his remaining
property. The State draws a distinction between the alleged damages from the drainage system in
its "existing right-of-way" and any damages from the "taking of [the] corner clip." The State argues
that it is entitled to judgment based on the only competent testimony of condemnation damages, the
value of the part taken as testified to by the State's witness. This issue goes to the compensability
of McCarley's damage claim arising from the drainage system, which we review de novo. Santikos,
144 S.W.3d at 459; Interstate Northborough, 66 S.W.3d at 220.


 1. Compensability of McCarley's claim

 In a statutory partial takings case, the property code provides for condemnation
damages as follows:

 

 If a portion of a tract or parcel of real property is condemned, the special
commissioners shall determine the damage to the property owner after estimating the
extent of the injury and benefit to the property owner, including the effect of the
condemnation on the value of the property owner's remaining property.



Tex. Prop. Code Ann. § 21.042(c) (West 2000). Section 21.042 "allows recovery only for the effects
of the State's use of the condemned land," which differs from the State's "new use of its existing
right-of-way or adjoining land." Interstate Northborough, 66 S.W.3d at 219; State v. Schmidt,
867 S.W.2d 769, 777-78 (Tex. 1993). The applicable statute also limits compensable damages in
a partial takings action by prohibiting recovery for "community damages." Tex. Prop. Code Ann.
§ 21.042(d). (5)

 Consistent with the county court's charge to the jury, statutory condemnation damages
to the remainder are calculated by ascertaining the difference between the market value of the
remainder immediately before and after the condemnation, taking into consideration the nature of
any improvements and the use of the land taken. See Interstate Northborough, 66 S.W.3d at 218;
State v. Carpenter, 89 S.W.2d 194, 197 (Tex. 1936); see also 4A-14 Julius L. Sackman, Nichols on
Eminent Domain § 14.01 (3d ed. 2006). (6) Market value is defined as "the price which the property
would bring when it is offered for sale by one who desires, but is not obligated to sell, and is bought
by one who is under no necessity of buying it." Carpenter, 89 S.W.2d at 202. The "willing-seller
willing-buyer" test of market value considers the factors "which would reasonably be given weight
in negotiations between a seller and a buyer." City of Pearland v. Alexander, 483 S.W.2d 244, 247
(Tex. 1972) (citing City of Austin v. Cannizzo, 267 S.W.2d 808 (Tex. 1954)). (7) Evidence of the
factors that "increase or diminish the present market value" is admissible, not as a measure of
damages or as a specific item of damage, but to allow the jury to arrive at the correct measure, the
"lessened value of the tract." Carpenter, 89 S.W.2d at 199-200; see also City of Sugar Land
v. Home & Hearth Sugarland, L.P., 215 S.W.3d 503, 512 (Tex. App.--Eastland 2007, pet. denied)
(testimony admissible on factors that a "willing buyer" would consider); 7A-G12 Patrick J. Rohan
et al., Nichols on Eminent Domain § G12.03 (3d ed. 2007) (evidence admissible to show elements
of damage that will cause a present diminution in market value of remainder). Admissible evidence
includes reasonably foreseeable and probable uses of the affected property. See Alexander,
483 S.W.2d at 249; Cannizzo, 267 S.W.2d at 815; 4-12B Julius L. Sackman, Nichols on Eminent
Domain § 12B.12 (3d ed. 2006). It also includes past and probable future injuries. See Alexander,
483 S.W.2d at 246-47 (damages include "present and prospective" damages that are the "natural,
necessary or reasonable incident of the improvement").

 The supreme court has addressed the recovery of damages for the diminution in value
to the remaining property in partial takings, placing emphasis on the particular facts and injuries
alleged in determining whether the landowner is entitled to compensable damages for a loss in value. 
See Santikos, 144 S.W.3d at 462-63; Interstate Northborough, 66 S.W.3d at 219; State v. Heal,
917 S.W.2d 6, 8 (Tex. 1996); Schmidt, 867 S.W.2d at 777-79. In Schmidt, landowners sought
damages for their remaining property's decrease in market value due to traffic diversion, more
circuitous access, decreased visibility, and the inconvenience of the State's construction activities
when a portion of their property was condemned as part of a highway project. 867 S.W.2d at 770. 
The supreme court held the remaining property's loss in value due to the owners' alleged injuries
was not compensable because the diminution was the result of the State's use of its existing right-of-way, not from the partial taking, and the damages were community damages. Id. at 776-81. It was
the community-wide change in the highway and not the loss of the strip of property that reduced the
remaining property's value. Id. at 778-79, 781. 

 Several years later in Heal, the supreme court again disallowed property owners'
recovery "for the diminution in value of their remaining property not directly attributable" to the
partial taking in a condemnation case. 917 S.W.2d at 11. The court reversed the award of damages,
disallowing the owners' claim for "noise damages and other damages incident to the overall effect"
of the highway project. Id. The court held the owners were "not entitled to compensation even if
the remainder of their property has lost some degree of value." Id.

 More recently, the supreme court allowed damages for the property's loss in value
in a condemnation suit in which the State was acquiring a partial strip of commercial property to
widen a highway and its frontage road. Interstate Northborough, 66 S.W.3d at 217. The landowner
sought diminution in value damages to the remaining property resulting from the increased proximity
to the roadway, with "attendant loss of curb appeal, green space, and 'buffer zone.'" Id. The
condemnation left the development on the property in violation of a deed restriction and a building
setback ordinance. Id. at 222. The jury awarded damages for the "decrease in the remainder
property's market value, as well as renovation costs to the remainder that the condemnation
necessitated." Id. at 218. The supreme court upheld the jury award, distinguishing the type of
damages that were disallowed in Schmidt from the "increased-proximity" damages that affected the
"remainder property in a special and unique way." Id. at 221-22.

 In another recent partial condemnation action, the supreme court, addressing
recoverable damages, disallowed recovery for the loss in the remaining property's value when the
county took 0.485 acres of land for constructing a frontage road on an existing right-of-way. 
Santikos, 144 S.W.3d at 455, 462-63. The highway project was to raise the roadbed, and the
condemned land was to serve as a sloping embankment. Id. at 458. The evidence was that the 27-acre tract of raw, unimproved land was in some places five to six feet below the existing highway
before the project and that, after the project, the land would be ten to eleven feet below the existing
highway's elevation in some places. Id. at 457-58. The experts for both sides agreed that the land's
best use was as an investment "until population and traffic grew to support development for retail
use." Id. at 458. The landowner sought damages for the "diminished market perception of the
remainder," seeking compensation of "almost $1 million, based mostly on the cost to raise the 3.5-acre tract alongside the embankment." Id. at 462-63. The landowner did not claim that the project
prevented him from developing his land.

 The supreme court reversed the jury's award, holding injury from the change in the
property's location to below the frontage road not compensable and that the jury should not have
considered the elevation change to determine the amount of damages:

 

 From the proposition that landowners have no right to insist that their premises be
visible, it follows that they have no right to insist that they remain at grade level. . . .
We hold that any damages resulting from leaving unimproved, raw land in its natural
state while raising or lowering an adjacent roadbed in hilly terrain are community in
nature.



Id. at 463. 

 With these principles in mind, I would reject the State's argument that McCarley's
damages are not compensable. McCarley's injury that forms the basis of his claim for diminution
in value to his remaining property from the State's drainage system is comparable to the type of
injury the land owners faced in Interstate Northborough, which injuries were found to be "special
and unique." 66 S.W.3d at 222. The State agrees that the type of injury that McCarley alleges was
not "community in nature," and there was no evidence that other properties faced the same type of
injury from the State's drainage system. I would hold that McCarley's injury from the diminution
in value of his property due to the drainage system was compensable, whether sought as an inverse
condemnation claim or as part of the State's statutory claim.


 2. Sufficiency of evidence at trial

 Both the State's and McCarley's appraisers testified that the appraisal process for
valuing vacant land includes determining the property's highest and best use, and that this
determination is limited to "legally permissible" uses of the property. (8) McCarley's site permitting
expert, an engineer with 30 years of experience, including site work for private and public works
projects, was the only witness to testify as to the City of Austin's permit requirements for stormwater
drainage and detention and how those requirements applied to McCarley's property. He testified that
the State's drainage system precludes the property from obtaining a site development permit because
the system was designed to accommodate only a 10-year storm event and the City of Austin requires
a landowner to show that the property is able to receive and handle upstream flows from a 100-year
storm event. (9)

 The State did not present evidence to dispute McCarley's engineer's testimony on this
issue. The State's engineer testified that he was not an expert on the City of Austin's requirements
for development:

 

 Q. You've never gone out and actually done a development for a landowner like
Mr. McCarley.

 

 A. No, sir. We never try and skimp and meet the bottom dollar; we just try and
do the right thing.

 

 Q. Yes, sir. You have never taken a development project through the City of
Austin.

 

 A. I have not.

 

 Q. You don't have knowledge as to what the City of Austin requires?

 

 A. I have some knowledge, but, no, I've never taken a project through.



The State also objected to McCarley questioning the State's engineer on "land planning issues" on
the ground that the questioning was outside the engineer's area of expertise:

 

 I'm objecting because this witness was offered as an expert as a witness on the design
of the facilities of the highway facility. He's asking him about things having to do
with Mr. McCarley's property that he was not involved in. So he's going outside of
what he was offered as an expert on.



In sum, the evidence showed that the City of Austin's requirements precluded development of the
remainder property.

 McCarley's real estate appraiser testified that because the remaining property could
not obtain a development permit, its use was comparable to a commercial site for outdoor vendor
sales such as Christmas trees. (10) The State's real estate appraiser confirmed that when a vacant lot
is being appraised in the "Austin/RoundRock market, entitlements are very important things that
[appraisers] have to look at: zoning, platting, site plans, those kinds of things." Although he
assumed for purposes of his appraisal that the remaining property could be permitted, he testified
that the property's value would be adversely impacted if it could not get a site development permit:

 

 Q. What we're really concerned about in the regulatory climate of the City of
Austin is whether we can get a site development permit for the property,
right?


 A. For the remainder, sure. Well, and the whole, yes.


 Q. Because if you can't get a site development permit, you can't develop any
permanent improvements on the property, right?


 A. True.


 Q. And [Lots 1 and 2 are] not worth very much if you can't get a site
development permit, are they?


 A. That's true.


* * * 


 Q. You do agree that that's the key inquiry is whether or not you could get a
permit from the City?


 A. It would be--The presumption of my remainder appraisal is that you could. 


 Q. And you went through the four steps of highest and best use. If you can't get
it legally permitted, you can't build it, and it's not the highest and best use,
right? 


 A. True.



 The trial court instructed the jury to consider the highest and best use. The jury
properly considered the evidence of probable uses that would be legally permissible before and after
the taking in deciding the ultimate issue of market value. See State v. Windham, 837 S.W.2d 73, 77
(Tex. 1992). Based on the evidence, the jury could have reasonably decided that the highest and best
use for the property prior to the taking was commercial development, that the highest and best use
after the taking was "outdoor vendor sales," and that the remaining property's value had been
significantly decreased by the State's condemnation and drainage system. It was within the jury's
province to resolve the conflicting evidence on value in McCarley's favor and to disregard the
State's argument that there was no diminution in value to the remaining property from the
condemnation. I would conclude the jury's award was within the range of the evidence and that the
evidence was competent and sufficient. For these reasons, I concur in the majority's decision to
affirm the judgment of the county court.


 

 __________________________________________

 Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Pemberton

Filed: December 20, 2007
1. The State provided evidence that Lot 1 was zoned in part GR (community commercial) and
in part single family at the time of the taking. The parties agreed, however, that prior to the taking,
the highest and best use for Lot 1 was for it to be developed commercially, although they disagreed
on the type of commercial development.
2. Because McCarley's claims concerning the drainage system in the statutory proceeding
were known to him, he had a duty to bring those claims in the condemnation proceeding or risk
losing them. See City of LaGrange v. Pieratt, 175 S.W.2d 243, 246 (Tex. 1943). In Pieratt, the
supreme court held that when a tract of land is condemned for roadway purposes and an owner
claims consequential damages to the remainder, all claims must be presented that could reasonably
have been foreseen and determined at the time, or they would be subsequently barred. Id. After the
condemnation action for a partial taking of his land had already concluded, Pieratt brought a separate
suit seeking lost profits in his business during construction of the improvements to the street. Id. at
244-45. Pieratt argued that his claim for lost profit damages was uncertain at the time of the
condemnation action. Id. at 246. In barring his subsequent suit, the supreme court stated that, in the
condemnation context, a plaintiff's damages for reasonably foreseen claims must only "be
ascertained with a reasonable degree of certainty," and the requirement is not that the damages be
"certainly or definitely proved." Id. at 246-47.
3. The evidence showed that the drainage system's design was complete "for all intents and
purposes" and that construction was substantially complete. 
4. There was evidence that resubmission of the 1998 site plan would have been futile. 
McCarley's land planner testified that there was nothing that McCarley could do to comply with the
City's requirement or to obtain a site permit for development.

5. Section 21.042(d) prevents recovery for community damages:


 In estimating injury or benefit under Subsection (c), the special
commissioners shall consider an injury or benefit that is peculiar to the property
owner and that relates to the property owner's ownership, use, or enjoyment of the
particular parcel of real property, but they may not consider an injury or benefit that
the property owner experiences in common with the general community.


Tex. Prop. Code Ann. § 21.042(d) (West 2000).
6. The State asserts that none of the drainage improvements that form the basis of McCarley's
claim are within the 836 square feet that the State condemned and, therefore, any injury from the
drainage system was incompetent evidence in the statutory condemnation proceeding. But there was
evidence that the State's design included drainage improvements within the 836 square feet. There
was evidence that a drainage pipe and approach ditch to the pipe were within the 836 square feet,
that "concrete riprap" was to be built on the condemned portion to prevent erosion, and that the
condemned property was to provide an embankment area that would back up water on McCarley's
remaining property. In any event, even if the evidence was limited to the State's uses of the 836
square feet, one use was for drainage. 
7. The measure of McCarley's damages is the same whether his claim is classified as an
inverse condemnation claim or as part of the statutory condemnation award. See State v. Schmidt,
867 S.W.2d 769, 775-76 (Tex. 1993) (rules of recovery generally are the same for inverse and
statutory condemnation awards). It is the diminution in value to McCarley's remainder property due
to the State's taking under either theory of recovery. See Tarrant Reg'l Water Dist. v. Gragg,
151 S.W.3d 546, 557-58 (Tex. 2004) (diminution in value one measure of damages in inverse
condemnation).
8. To determine the highest and best use, the testimony was that an appraiser considers four
components, "what's legally permissible, what's physically possible, what's financially feasible,
and what's maximally productive." Evidence on development issues is admissible in takings cases
as part of an expert's valuation determination and the expert's basis for the highest and best use of
property without the necessity of obtaining a definitive decision from the governmental entity
involved. See City of Austin v. Cannizzo, 267 S.W.2d 808, 815 (Tex. 1954) (testimony of existence
of zoning ordinance that prohibited prospective use admissible and "jury could weigh the
effect of the restriction against the prospective use" in determining market value); City of Sugar
Land v. Home & Hearth Sugarland, L.P., 215 S.W.3d 503, 511-12 (Tex. App.--Eastland 2007,
pet. denied); 7A-G12 Patrick J. Rohan et al., Nichols on Eminent Domain § G12.03 (2)(a)
(3d ed. 2007); cf. City of Houston v. Kolb, 982 S.W.2d 949, 952 (Tex. App.--Houston [14th Dist.]
1999, pet. denied) (regulatory takings claim requires final decision regarding the application of the
regulation to the property at issue or showing that futility exception applies).
9. The State's motion to exclude McCarley's evidence did not seek to exclude McCarley's
experts on the basis of relevance, reliability, or qualifications. See Tex. R. Civ. P. 702. The State's
motion was based on the same issues that have been raised on appeal concerning McCarley's inverse
condemnation claim--ripeness, requisite intent, and justiciability.
10. The parties disputed which properties were included in the condemnation proceeding. 
McCarley's experts included both Lot 1 and Lot 2 in their valuation determinations, and the State's
experts only included Lot 1. There was evidence supporting a damage award based on both lots. 
See State v. Windham, 837 S.W.2d 73, 77 (Tex. 1992) (landowner ordinarily has right to damages
to the "entire remainder provided it is contiguous and there is unity of use").