The STATE of Texas, Appellant,

v.

Lloyd S. McCARLEY et al., Appellee.

No. 03–07–00069–CV.

Court of Appeals of Texas,
Austin.

Dec. 20, 2007.

Rehearing Overruled Feb. 21, 2008.

Sherry L. Peel, Asst. Atty. Gen., Austin, TX, for Appellant.

John McClish, Womack, McClish, Wall & Foster, P.C., Austin, TX, for Appellee.

Before Justices PATTERSON, PURYEAR and PEMBERTON.

## *OPINION*

BOB PEMBERTON, Justice.

The State of Texas appeals from a judgment in a statutory condemnation proceeding awarding Lloyd McCarley $366,820 as just compensation for the State's taking of 836 square feet from his property for use in the Texas Department of Transportation's construction of the State Highway 45 toll road project. The judgment was based on a jury's verdict on a single issue inquiring as to the amount of damages. The jury awarded $371,000. The trial court credited the State's prior deposit of the amount of the special commissioner's award in order to take possession—$4,180—to yield the judgment amount.

The State argues that the evidence is legally and factually insufficient to support the jury's damages award. At trial, McCarley presented proof that the State's use of his property severely diminished the value of his remainder by altering its drainage in a manner making it impossible for him to meet the City of Austin's requirements for obtaining the permits necessary to develop it. The State urges that such damages "do not arise from the condemnation of the 836 square feet or to the uses which will be made by TxDOT of the 836 square feet [but] arise from an alleged use of TxDOT's existing right of way," and, consequently, are not compensable. *See State, City of Austin v. Schmidt*, 867 S.W.2d 769, 777–79 (Tex.1993). Based on that same premise, the State argues that McCarley has asserted only an inverse condemnation claim. *See* Tex. Const. art. I, § 17; *City of Austin v. Casiraghi*, 656 S.W.2d 576, 579–80 (Tex.App.-Austin 1983, no pet.).[1] It brings several issues challenging whether McCarley's "inverse con-

demnation claim" is ripe where the property has not actually flooded and McCarley has not applied for and been denied a development permit, *see Hubler v. City of Corpus Christi*, 564 S.W.2d 816, 822–23 (Tex.Civ.App.-Corpus Christi 1978, writ ref'd n.r.e.); whether McCarley properly pled and proved the intent element of an inverse condemnation claim, *see City of Dallas v. Jennings*, 142 S.W.3d 310, 314 (Tex.2004); and whether McCarley retained a justiciable interest in his "inverse condemnation claim."

Because we conclude that the evidence was legally and factually sufficient to support the jury's award of $371,000 as damages for the State's statutory condemnation of McCarley's property, we will affirm the trial court's judgment.

To address the State's challenge to the jury's damages award, we apply the familiar standards of legal and factual sufficiency review.[2] With each, the starting point of

---

1. In apparent response to such arguments by the State prior to trial, McCarley asserted a "conditional counterclaim in inverse condemnation," pleading "[t]o the extent necessary . . . in inverse condemnation for damages resulting from the drainage problems caused by the project."

2. We sustain a legal sufficiency complaint if the record reveals: (a) the complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex.2005). The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *See id.* at 827.

When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal effect, is no evidence. *See Ford Motor Co. v.*

*Ridgway*, 135 S.W.3d 598, 601 (Tex.2004). But more than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.* We review the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller*, 168 S.W.3d at 807.

When reviewing a challenge to the factual sufficiency of the evidence supporting a vital fact, we must consider, weigh, and examine all of the evidence in the record, both supporting and against the finding, to decide whether the verdict should be set aside. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986). We should set aside the verdict only if the evidence that supports the jury finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). But we may not merely substitute our judgment for that of the jury. *Pool*, 715 S.W.2d at 635. The jury remains the sole judge of witnesses' credibility and the weight to be given

our analysis—barring a preserved and valid complaint of charge error—is the charge actually submitted to the jury. *Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex. 2000) (legal sufficiency); *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 762 (Tex.2003).(factual sufficiency); *Ancira Enters., Inc. v. Fischer,* 178 S.W.3d 82, 93 (Tex.App.-Austin 2005, no pet.). The State brings no complaint of charge error on appeal.

The sole issue submitted to the jury inquired:

> On September 16, 2003 [the date the State took possession of the property], what was the difference between (a) the fair market value of the landowner's whole property before the taking, excluding any consideration of the condemnation or proposed project and (b) the fair market value of the remainder only, after the taking, giving consideration to the uses to which the condemned part is to be subjected.
>
> \* \* \*
>
> Answer by stating the difference in Fair Market Value in dollars and cents.

The jury was given the following definitions:

> "Fair Market Value" means the price which the property would bring when it is offered for sale by one who desires, but is not obligated to sell, and is bought by one who is under no necessity of buying it, taking into account all of the uses to which it is reasonably adaptable and for which it either is or in all reasonable probability will become available within a reasonable future period. In making your determination of Fair Market Value, you will consider the "Highest and Best Use" of the land involved.

> "Highest and Best Use" means that legal use to which the property could have been adapted on the date of taking, or within the reasonably foreseeable future thereafter which was legally permissible, physically possible, financially feasible, and provided the owner with the greatest net return.

The jury was thus instructed to calculate McCarley's damages by comparing the fair market value of his property before and after the taking, reflecting both the loss of the part taken plus any diminution of the remainder's value. *See Westgate, Ltd. v. State,* 843 S.W.2d 448, 456–57 (Tex.1992) (explaining that this form of submission is appropriate in cases where the part taken is difficult to value as severed land and there is no evidence that the condemnation increased the remainder's value).

 The charge further directed the jury that, when calculating these measures of fair market value, its ultimate focus should be the price the property would have brought in a transaction between a willing seller and willing buyer at the time. *See City of Austin v. Cannizzo,* 153 Tex. 324, 267 S.W.2d 808, 812–15 (1954); *State v. Carpenter,* 126 Tex. 604, 89 S.W.2d 194, 200 (1936). To that end, Texas courts have long held it appropriate, as a general rule, for a jury to consider "all factors . . . which would reasonably be given weight in negotiations between a seller and a buyer" of the property. *Cannizzo,* 267 S.W.2d at 814; *Carpenter,* 89 S.W.2d at 200 ("Generally, it may be said that it is proper as touching the matter of the value and depreciation in value to admit evidence upon all such matters as suitability and adaptability, surroundings, conditions before and after, and all circumstances which tend to increase or diminish the present market value."). Thus, the jury may consider current and reasonably probable future poten-

their testimony. *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003).

tial uses of the property, as well as consequential damages that it is reasonably foreseeable will result from the condemnor's uses of the condemned property, as such factors would ordinarily be given weight by willing buyers and sellers and, therefore, would be reflected in the property's fair market value. *See Spindor v. Lo–Vaca Gathering Co.,* 529 S.W.2d 63, 65–66 (Tex.1975); *Cannizzo,* 267 S.W.2d at 814–15. Conversely, purely speculative potential uses or injuries are not probative of fair market value. *Id.* at 814 (willing seller-willing buyer test of market value "exclude[s] consideration of purely speculative uses to which the property might be adaptable but wholly unavailable but would permit consideration of all uses to which the property was reasonable adaptable and for which, or in reasonable probability would become, available within a reasonable time."); *Carpenter,* 89 S.W.2d at 200 ("Evidence . . . relating to remote, specula-

tive, and conjectural uses, as well as injuries, which are not reflected in the present market value of the property" should be excluded); *see also Texas Elec. Serv. Co. v. Campbell,* 161 Tex. 77, 336 S.W.2d 742, 744–45 (1960) (testimony that it was "possibly probable" that town would later expand so as to make property suitable for industrial uses was not probative of the property's fair market value).[3]

■ These principles, in part, enable a landowner to recover all reasonably foreseeable consequential damages from the taking in the statutory condemnation proceeding and not be "burdened with the delay and expense of future lawsuits." *White v. Natural Gas Pipeline Co. of Am.,* 444 S.W.2d 298, 301 (Tex.1969). In fact, a landowner's failure to seek all reasonably foreseeable damages in the condemnation proceeding may *bar* his future claims for those damages. *See City of La Grange v. Pieratt,* 142 Tex. 23, 175 S.W.2d 243, 244–

---

**3.** As the supreme court has summarized these governing principles:

> It has been uniformly recognized in the development and refinement of the market value test for determining severance damages that the *State v. Carpenter* method of trial and submission is appropriate in all but exceptional cases. The jury is instructed that the term market value is the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying. The jury is asked to find the market value of the remainder tract immediately before the taking and the market value thereof immediately after the taking. In the determination of the latter, the jury is instructed to take into consideration the uses to which the land taken is to be subjected. The answers to the issues are to be determined in the light of the evidence offered by the parties and admitted under the rulings of the trial court. As said in *State v. Carpenter,* everything which affects the market value of the land itself, having due regard for past and probable future injuries, may be accurately reflected by ascertaining

the difference in value, when all the legitimate testimony is properly submitted to the jury for consideration; and it is proper to admit evidence upon all matters which tend to increase or diminish the present market value. The landowner may recover damages which are reasonably foreseeable, and he may show the reasonably probable uses of the tract taken that are calculated to depress the value of the remainder tract and thus enhance the recovery of damages. *See Cannizzo, supra,* where it was recognized that the determination of the value of a tract taken permits consideration of all uses to which the property was reasonably adaptable and for which it was, or in reasonable probability would become, available within a reasonable time. But the public authority should not be required to pay severance damages on the basis of uses of the tract taken which are not at the time of the taking so reasonably probable as to be reflected in present market value and the jury should be permitted to give such weight to this factor as a prospective purchaser of the remainder tract would give. *City of Pearland v. Alexander,* 483 S.W.2d 244, 247–48 (Tex.1972).

46 (1943) [4]; *see also Casiraghi,* 656 S.W.2d at 579 (Tex.App.-Austin 1983, no pet.) ("In eminent domain proceedings the property owner is given a single opportunity to recover damages for the taking of his property for public use.").

■ The jury heard evidence that, at relevant times, McCarley had owned two adjacent undeveloped lots totaling approximately 1.75 acres in size. One lot, approximately 1.0106 acres in size, was situated at the corner of Ranch Road 620, a busy thoroughfare that ran generally east-west at that location, and Lyndhurst Street, which ran generally north-south until it ended at its intersection with 620. Both roads were originally at grade level. The second lot, roughly .7381 acres in size, sat immediately south of the first lot, its east side fronting Lyndhurst. As of the date of taking, the property was partially within the City of Austin, and the rest within the City's extraterritorial jurisdiction.

McCarley presented evidence that although he had not yet developed the property, he had previously performed extensive planning and permitting in anticipation of developing it for commercial uses. In 1996, McCarley hired a land planner, Richard Crank, and an engineer, Curtis Wilson, to complete a subdivision of the property and obtain the necessary permits to develop the site. Wilson obtained general retail zoning for the portion within the Austin city limits. Crank prepared the necessary applications and obtained approval for a two-lot subdivision with a front-lot retail development and rear-lot office development. Wilson engineered a utility plan for water and wastewater service, which was approved, as well as a plan for stormwater abatement that was approved by the Texas Natural Resource and Conservation Commission. Wilson also designed a stormwater drainage and detention plan, which the City approved after requiring a restrictive covenant requiring that the two lots would share water quality and stormwater detention facilities and be developed only as a unified development. The City eventually granted full site plan approval for development of the property.

The jury heard evidence regarding the City of Austin's requirements that McCarley had to meet to obtain his site development permit. These included three forms of stormwater management regulations: (1) environmental regulations requiring that the property have ponds that would detain the rainwater falling onsite in a 2–year storm; (2) drainage criteria requiring the property to have ponds designed to retain the rainwater falling onsite in a 100–year storm, detain the water, and release it slowly at a rate no greater than the flow from the property's natural, pre-development state; and (3) requirements that the property be designed to receive all stormwater from a 100–year storm that would

---

4. In *Pieratt,* the City condemned a portion of Pieratt's service station property for use in widening a road. Pieratt was awarded compensation in the statutory condemnation proceeding. Subsequently, Pieratt sued for additional consequential damages, lost profits he attributed to loss of access to his business during the road construction. The supreme court held that Pieratt's suit was barred. It concluded that Pieratt's lost profits damages had been foreseeable at the time of the statutory condemnation proceeding where "this record shows that Pieratt knew, or could have known, the character of the street improvement at the time of the condemnation; and, furthermore, at such time he knew, or could have known, the terms of the contract under which it was to be consummated." *City of La Grange v. Pieratt,* 142 Tex. 23, 175 S.W.2d 243, 246 (1943). The court further reasoned that because Pieratt "had such right [to recover his expected lost profits in the condemnation proceeding ...] we think it follows, as a matter of course, that it was his duty to do so." *Id.* at 246.

flow to the property from its entire natural upstream basin if the basin was fully developed, and pass it through the property contained in a dedicated easement or public right-of-way. Wilson explained that he encountered some difficulties in satisfying these requirements stemming from the area's flat topography.

Although the State emphasizes that McCarley's site development permit had expired before it condemned his property, evidence that McCarley had succeeded in obtaining one is nonetheless probative of the reasonably foreseeable uses of McCarley's property before it was condemned. *See Cannizzo,* 267 S.W.2d at 814–15. McCarley's appraiser testified that the two lots constituted a single property for valuation purposes. He separately valued each lot in terms of their respective pre-condemnation highest and best uses—the "front" lot retail, the "back" lot office—as reflected in the market prices of comparable area properties with similar uses, adjusted for characteristics unique to the McCarley property. Based on this analysis, the appraiser valued McCarley's front lot at $400,000 and the back lot $75,000, for a total of $475,000. The State's appraiser, by contrast, opined that only McCarley's front lot should be considered as the relevant property for valuation purposes. He valued this lot, pre-condemnation, at $246,523.

The State condemned a 836 square-foot triangular "corner clip" from McCarley's front lot at the 620–Lyndhurst intersection. The property was to be used in TxDOT's conversion of part of 620 into the State Highway 45 toll road. Construction evidently was underway but not yet completed by time of trial. TxDOT's plans were to elevate the existing 620 roadway

five to seven feet on a solid retaining wall within the existing right-of-way along McCarley's front lot. This road would serve as a frontage road for Texas 45. Lyndhurst would similarly be elevated on an embankment for several hundred feet to meet the new, higher frontage road at the site of the former intersection with 620. According to the State's engineering expert, the corner clip taken from McCarley's property would be used in building an embankment area needed to raise the roadways and "to find a place maybe for utilities to make a bend and serve folks down Lyndhurst."[5] There was also evidence that this embankment served purposes within TxDOT drainage system for Texas 45. Wilson, McCarley's engineering expert, testified that during a 100–year storm, TxDOT's drainage system would cause stormwater from properties west of McCarley's to flow eastward through a ditch running beside the Texas 45 frontage road and alongside McCarley's property, where the Lyndhurst embankment would effectively function as a dam and cause the waters to pool there and flood McCarley's property. The waters would continue to rise until they spilled over Lyndhurst.

Although the State's engineering expert disputed Wilson's analysis—he insisted that a 24–inch pipe TxDOT was laying under Lyndhurst would sufficiently drain any stormwater from McCarley's side of that street—there was evidence consistent with TxDOT's anticipating that McCarley's property would flood. The State's appraiser testified that TxDOT intended to build concrete riprap in the corner clip area to prevent erosion at the Lyndhurst intersection. Also, during its negotiations with McCarley, TxDOT had contemplated constructing an 18–inch reinforced con-

---

**5.** The witness explained that "[a] lot of times they don't like to do a 90 [degree turn] be- cause they get losses."

crete pipe running from McCarley's property and through the corner clip that would drain water from McCarley's property. Further, as another component of the Texas 45 project, TxDOT designed and constructed a berm or wall near a school across Lyndhurst from McCarley's property. Wilson testified that the wall is located beyond where stormwater would overflow Lyndhurst from McCarley's property, adding that TxDOT had placed a concrete channel along the wall that would divert stormwater toward a creek. TxDOT's own plans, in fact, termed this structure a "retaining wall."

The State's engineering expert, who had oversight responsibilities during the design phase of the Texas 45 project, testified that the "retaining wall" was actually intended to shield the school from noise likely to come from the elevated main lanes of Texas 45, which were to be several feet higher than the frontage roads. He explained that "[t]he plan sheets refer to it as a retaining wall because we're trying to help out the school and we can't call it anything else because we're not meeting federal mandates" to obtain federal funding for a noise wall, adding that "I'm probably going to get in a lot of trouble for saying that we built one anyway, but we did." However, the witness acknowledged that the agency had stopped short of "building a full blown, we're going to get in trouble, kind of sound wall," and he could not say that it would be effective given that the roadway was higher than the school. It was within the province of the jury to weigh the credibility of the State's explanations of its "retaining wall."

McCarley presented evidence that TxDOT's use of the corner clip to elevate roadways and in its drainage system have destroyed his ability to develop the remainder. Wilson explained that to re-permit the remainder, McCarley would be required to satisfy the same City of Austin stormwater management regulations that he had successfully met when obtaining his earlier development permit. These requirements, again, included demonstrating that his property had been designed to receive all stormwater from a 100–year storm that would flow to the property from its entire natural upstream basin if the basin was fully developed, and pass it through the property through a dedicated easement or public right-of-way. Wilson opined that McCarley no longer met these requirements and that there was nothing McCarley could do to remedy noncompliance and obtain a permit to develop the remainder or any part of it. The State did not controvert Wilson's testimony regarding McCarley's ability to obtain the City of Austin permits required to develop his remainder. *See Cannizzo,* 267 S.W.2d at 814–15 (explaining that evidence of reasonably probable future changes in zoning of property may be probative of its uses and fair market value). The record also reflects that the State was made aware, prior to trial, of McCarley's concerns that its uses of the corner clip would cause flooding and prevent development of his remainder. *See Spindor,* 529 S.W.2d at 65–66 (damages to remainder from erosion of road in condemned portion was foreseeable and could be recovered in statutory condemnation action; landowner testified that he had warned condemnor that its road would erode in heavy rain); *see also Pieratt,* 175 S.W.2d at 244–46 (landowner was required to seek any foreseeable remainder damages in the statutory condemnation proceeding).

McCarley's appraiser opined that the uses of the remainder to a willing buyer is comparable to that of property with greatly restricted uses, like Christmas tree sales. He calculated the remainder's fair market value as $72,000. Subtracting this figure from the pre-condemnation fair

market value of McCarley's property yielded total damages of $403,000. The State's appraiser calculated the value of the remainder (which did not include the back lot) as $241,841, yielding total damages of $4,682. The State's appraiser acknowledged, however, that his analysis presumed McCarley's ability to develop the remainder and that the remainder would not be worth much if McCarley could not obtain the permits required to develop it. The jury's damages award of $371,000 is within this range of evidence presented.

The State's sole challenge to the sufficiency of the evidence supporting the jury's award is that any diminution in the value of McCarley's remainder is not compensable because it arose from the State's use of its existing right-of-way along the former 620 and not its use of the corner clip. *See Schmidt,* 867 S.W.2d at 777–79. We disagree. As the evidence we have surveyed demonstrates, McCarley's remainder damages arose from the use to which the State subjected the corner clip—elevating roadways and controlling stormwater—and not merely the State's use of existing right of way or other property. *See Interstate Northborough P'ship v. State,* 66 S.W.3d 213, 221–22 (Tex.2001) (landowner claimed that condemnation of property to widen freeway damaged remainder by causing building on remainder to violate setback ordinances and deed restrictions; damages were attributable to taking and not to entire highway expansion project); *State v. Heal,* 917 S.W.2d 6, 8 (Tex.1996) (homeowner's claim for remainder damages for decreased access from taking of part of yard to widen road in manner creating bottleneck was distinguishable from claim based on impact of larger project to widen nearby freeway and residential arteries); *cf. County of Bexar v. Santikos,* 144 S.W.3d 455, 462–63 (2004) (damages for lessened access and visibility were attributable to State's eleva-

tion of roadway within existing right-of-way, not construction of embankment on condemned property to support elevated roadway; "the remainder property would be just as much 'in a hole' and no easier to access if the frontage road were supported by a wall or columns rather than a sloping shoulder"); *Schmidt,* 867 S.W.2d at 777–79 (claimed damages for diversion of traffic, circuitry of travel, impaired visibility, and inconvenience from construction were attributable to overall project, not taking of small strips from property). We also note that the charge, in relevant part, inquired as to "the fair market value of the remainder only, after the taking, *giving consideration to the uses to which the condemned part is to be subjected,*" but did not require the jury to *isolate* the effect of the corner clip's uses to elevate roadways or control stormwater from that of other adjacent property devoted to the same uses. If there is any error in the form of that submission, it is waived. *See Harris County v. Smith,* 96 S.W.3d 230, 236 (Tex. 2002); *Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 390 (Tex.2000). We overrule the State's evidentiary-sufficiency challenge to the jury's award of $371,000 as damages from the statutory condemnation of McCarley's property.

In light of this conclusion, we need not address the State's issues presuming that McCarley's damages are recoverable only under an inverse condemnation theory, and we express no opinion regarding them.

We affirm the trial court's judgment.

Concurring Opinion by Justice PATTERSON.

JAN P. PATTERSON, Justice, concurring.

I concur in the majority's decision to affirm the judgment of the county court, but write separately in the interest of fully

addressing the issues raised by the parties on appeal.

This appeal arises from a statutory condemnation action filed by the State of Texas against Lloyd S. McCarley for a portion of his property needed for a highway project. The jury awarded $371,000 to McCarley. In five issues, the State contends on appeal that (1) McCarley's claim for damages was an inverse condemnation claim; (2) the trial court did not have subject matter jurisdiction over the inverse condemnation claim because it was not ripe; (3) the State has sovereign immunity because McCarley failed to plead and prove the requisite intent for an inverse condemnation claim; (4) McCarley does not have a justiciable interest in the inverse condemnation claim; and (5) there was no competent evidence or, in the alternative, insufficient evidence to support the jury's award of $371,000 in damages. For the reasons that follow, I would affirm the county court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In April 2004, the State brought a condemnation suit to acquire a "corner clip" of McCarley's property located at the corner of Ranch Road 620 and Lyndhurst Street in Williamson County. The State sought to acquire 836 square feet of land as part of its project to widen and improve Ranch Road 620 to become State Highway 45. The project included elevating the highway frontage road by several feet above existing grade on a solid retaining wall across McCarley's property and elevating Lyndhurst for several hundred feet to meet the new, higher frontage road at the former intersection with 620. The county

court appointed a panel of special commissioners to determine the amount of adequate compensation to be paid by the State. The commissioners awarded McCarley $4,180 in damages. McCarley objected to the commissioners' award and appealed to the county court.

At the time of the condemnation, McCarley's property, consisting of two lots and approximately 1.75 acres, was vacant. The lot that fronted 620 ("Lot 1") was zoned, in part, "GR, retail," and the lot that fronted Lyndhurst ("Lot 2") was zoned "interim single family."[1] The City of Austin had approved a site plan for the two lots in 1998, requiring the "unified development" of the two lots for water quality and stormwater detention. The permitted use under the 1998 site plan was retail for Lot 1 and office or warehouse for Lot 2. The 1998 site plan for the two lots expired in 2001, and McCarley did not apply for additional site development permits prior to the condemnation suit.

Prior to trial, McCarley filed a "conditional counterclaim in inverse condemnation" for "damages resulting from the drainage problems caused by [the State's] project." In response, the State filed a plea to the jurisdiction and a motion to exclude McCarley's evidence. In the plea to the jurisdiction, the State asserted that McCarley's counterclaim should be dismissed based on sovereign immunity because he failed to plead the "intent" required for an inverse condemnation claim, that there was a lack of ripeness because no flooding had occurred and no site plan had been denied, and that McCarley lacked a justiciable interest because he no longer owned the property. In the motion to exclude McCarley's evidence, the State

1. The State provided evidence that Lot 1 was zoned in part GR (community commercial) and in part single family at the time of the taking. The parties agreed, however, that pri-

or to the taking, the highest and best use for Lot 1 was for it to be developed commercially, although they disagreed on the type of commercial development.

sought exclusion on similar grounds to its plea to the jurisdiction. The trial court denied both the plea and the motion, and the case proceeded to trial.

At trial, McCarley called three experts, a land planner/development consultant, a civil engineer/design consultant, and a real-estate appraiser. The land planner testified that he assisted McCarley in the site planning process, starting in 1996 and continuing through the 1998 approval of the site plan for the lots' development. He testified that the process took "about 16 months." He also testified that McCarley contacted him after the site plan expired about resubmitting the site plan for approval, but that resubmission was put on hold after McCarley learned of the State's highway project.

The engineer testified concerning the highway project's drainage system. He opined that the system prevented McCarley's remainder property from being developed within the City of Austin's requirements for stormwater management. The engineer testified that the City requires that a property be designed to receive and address all stormwater from a 100–year storm event that would flow to the property from the drainage basin upstream. It was the engineer's opinion that as a result of the drainage system, stormwater would back up on the remaining property in a 100–year storm event and the City of Austin would not grant a permit for any type of development for the remainder.

McCarley's appraiser testified to the market values of the property before and after the taking and the effect of the State's drainage system on the remainder's value. He recommended compensation for the taking of $403,000. His recommendation was based in part on the engineer's conclusions concerning the inability to develop the property after the taking because of the highway project's drainage system. He testified that the highest and best use for Lot 1 at the time of the taking was commercial or retail, and he placed a value on Lot 1 prior to the taking of $400,000. He supported his value by analyzing comparable sales in the area. He testified that Lot 2's highest and best use was "office/warehouse," and he placed a value of $75,000 on Lot 2 prior to the taking, also based on comparable sales in the area. He concluded that the remainder value for both lots after the taking was $72,000. He reached this conclusion by reducing the lots' value before the taking by 85% due to the inability to develop the property in light of the highway project's drainage system. In reaching the remainder's value, he compared "properties that had flooding problems and those that didn't, and then compared how much the difference of prices were." He also arrived at a similar value for the remainder using the income approach, "what a buyer would pay for a particular income stream." Under this approach, he compared rents for commercial sites that were used for "outdoor vendor sales" such as Christmas trees to arrive at a value for the remainder property.

The State's witnesses were the engineer in charge of the highway project's construction, a land planner/architect, and a real-estate appraiser. The engineer explained the design and construction of the highway project's drainage system. The land planner/architect testified concerning zoning for Lot 1, concluding that the "highest zoning" was "neighborhood office." Relying in part on the State's other expert's conclusions, the appraiser recommended compensation for the taking in the amount of $4,682, the market value of the 836 square feet. The appraiser did not include any compensation for the remaining property as it was his opinion that the condemnation of the 836 square feet did

addressing the issues raised by the parties on appeal.

This appeal arises from a statutory condemnation action filed by the State of Texas against Lloyd S. McCarley for a portion of his property needed for a highway project. The jury awarded $371,000 to McCarley. In five issues, the State contends on appeal that (1) McCarley's claim for damages was an inverse condemnation claim; (2) the trial court did not have subject matter jurisdiction over the inverse condemnation claim because it was not ripe; (3) the State has sovereign immunity because McCarley failed to plead and prove the requisite intent for an inverse condemnation claim; (4) McCarley does not have a justiciable interest in the inverse condemnation claim; and (5) there was no competent evidence or, in the alternative, insufficient evidence to support the jury's award of $371,000 in damages. For the reasons that follow, I would affirm the county court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In April 2004, the State brought a condemnation suit to acquire a "corner clip" of McCarley's property located at the corner of Ranch Road 620 and Lyndhurst Street in Williamson County. The State sought to acquire 836 square feet of land as part of its project to widen and improve Ranch Road 620 to become State Highway 45. The project included elevating the highway frontage road by several feet above existing grade on a solid retaining wall across McCarley's property and elevating Lyndhurst for several hundred feet to meet the new, higher frontage road at the former intersection with 620. The county court appointed a panel of special commissioners to determine the amount of adequate compensation to be paid by the State. The commissioners awarded McCarley $4,180 in damages. McCarley objected to the commissioners' award and appealed to the county court.

At the time of the condemnation, McCarley's property, consisting of two lots and approximately 1.75 acres, was vacant. The lot that fronted 620 ("Lot 1") was zoned, in part, "GR, retail," and the lot that fronted Lyndhurst ("Lot 2") was zoned "interim single family."[1] The City of Austin had approved a site plan for the two lots in 1998, requiring the "unified development" of the two lots for water quality and stormwater detention. The permitted use under the 1998 site plan was retail for Lot 1 and office or warehouse for Lot 2. The 1998 site plan for the two lots expired in 2001, and McCarley did not apply for additional site development permits prior to the condemnation suit.

Prior to trial, McCarley filed a "conditional counterclaim in inverse condemnation" for "damages resulting from the drainage problems caused by [the State's] project." In response, the State filed a plea to the jurisdiction and a motion to exclude McCarley's evidence. In the plea to the jurisdiction, the State asserted that McCarley's counterclaim should be dismissed based on sovereign immunity because he failed to plead the "intent" required for an inverse condemnation claim, that there was a lack of ripeness because no flooding had occurred and no site plan had been denied, and that McCarley lacked a justiciable interest because he no longer owned the property. In the motion to exclude McCarley's evidence, the State

---

1. The State provided evidence that Lot 1 was zoned in part GR (community commercial) and in part single family at the time of the taking. The parties agreed, however, that prior to the taking, the highest and best use for Lot 1 was for it to be developed commercially, although they disagreed on the type of commercial development.

sought exclusion on similar grounds to its plea to the jurisdiction. The trial court denied both the plea and the motion, and the case proceeded to trial.

At trial, McCarley called three experts, a land planner/development consultant, a civil engineer/design consultant, and a real-estate appraiser. The land planner testified that he assisted McCarley in the site planning process, starting in 1996 and continuing through the 1998 approval of the site plan for the lots' development. He testified that the process took "about 16 months." He also testified that McCarley contacted him after the site plan expired about resubmitting the site plan for approval, but that resubmission was put on hold after McCarley learned of the State's highway project.

The engineer testified concerning the highway project's drainage system. He opined that the system prevented McCarley's remainder property from being developed within the City of Austin's requirements for stormwater management. The engineer testified that the City requires that a property be designed to receive and address all stormwater from a 100–year storm event that would flow to the property from the drainage basin upstream. It was the engineer's opinion that as a result of the drainage system, stormwater would back up on the remaining property in a 100–year storm event and the City of Austin would not grant a permit for any type of development for the remainder.

McCarley's appraiser testified to the market values of the property before and after the taking and the effect of the State's drainage system on the remainder's value. He recommended compensation for the taking of $403,000. His recommendation was based in part on the engineer's conclusions concerning the inability to develop the property after the taking because of the highway project's drainage system. He testified that the highest and best use for Lot 1 at the time of the taking was commercial or retail, and he placed a value on Lot 1 prior to the taking of $400,000. He supported his value by analyzing comparable sales in the area. He testified that Lot 2's highest and best use was "office/warehouse," and he placed a value of $75,000 on Lot 2 prior to the taking, also based on comparable sales in the area. He concluded that the remainder value for both lots after the taking was $72,000. He reached this conclusion by reducing the lots' value before the taking by 85% due to the inability to develop the property in light of the highway project's drainage system. In reaching the remainder's value, he compared "properties that had flooding problems and those that didn't, and then compared how much the difference of prices were." He also arrived at a similar value for the remainder using the income approach, "what a buyer would pay for a particular income stream." Under this approach, he compared rents for commercial sites that were used for "outdoor vendor sales" such as Christmas trees to arrive at a value for the remainder property.

The State's witnesses were the engineer in charge of the highway project's construction, a land planner/architect, and a real-estate appraiser. The engineer explained the design and construction of the highway project's drainage system. The land planner/architect testified concerning zoning for Lot 1, concluding that the "highest zoning" was "neighborhood office." Relying in part on the State's other expert's conclusions, the appraiser recommended compensation for the taking in the amount of $4,682, the market value of the 836 square feet. The appraiser did not include any compensation for the remaining property as it was his opinion that the condemnation of the 836 square feet did

not reduce the remainder's value. His opinions were confined to Lot 1, placing a value of approximately $240,000 on the lot immediately before and after the taking, and that "neighborhood office development" was the highest and best use for the lot. He was aware of McCarley's reports that the "drainage system would not work right," but his opinions assumed that the property could "get a site development permit," and relied on the State's engineering report that "the drainage worked just fine."

The jury was given one question—the difference in market value of McCarley's property immediately before the taking and the market value of the remaining property after the taking, with definitions of "fair market value" and "highest and best use":

> On September 16, 2003, what was the difference between (a) the fair market value of the landowner's whole property before the taking, excluding any consideration of the condemnation or proposed project and (b) the fair market value of the remainder only, after the taking, giving consideration to the uses to which the condemned part is to be subjected.
>
> "Fair Market Value" means the price which the property would bring when it is offered for sale by one who desires, but is not obliged to sell, and is bought by one who is under no necessity of buying it, taking into consideration all of the uses to which it is reasonably adaptable and for which it either is or in all reasonable probability will become available within a reasonable future period. In making your determination of Fair Market Value, you will consider the "Highest and Best Use" of the land involved.
>
> "Highest and Best Use" means that legal use to which the property could have been adapted on the date of taking,

or within the reasonably foreseeable future thereafter which was legally permissible, physically possible, financially feasible, and provided the owner with the greatest net return.

After the jury determined the difference in value to be $371,000, the county court credited the State's prior deposit of the amount of the special commissioner's award against the jury's award and entered judgment against the State. The State's appeal followed.

## ANALYSIS

### Standard of Review

The State raises both legal and factual sufficiency issues as to the jury's award of damages for the statutory partial taking of McCarley's property. "In determining whether a finding is supported by legally sufficient evidence, we consider the evidence in the most favorable light, and indulge every inference in its favor." *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 552 (Tex.2004). "If the record contains more than a scintilla of evidence that supports the finding, we must sustain it." *Id.* Incompetent evidence is legally insufficient to support a judgment. *City of Keller v. Wilson*, 168 S.W.3d 802, 812 (Tex. 2005).

In reviewing the factual sufficiency of the evidence, we consider, weigh, and examine all the evidence presented at trial, including any evidence contrary to the judgment. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). We set aside a finding for factual insufficiency if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). With both legal and factual sufficiency review, the starting point of analysis is the charge that was submitted to the jury absent complaint on appeal. *Osterberg v. Peca*, 12

S.W.3d 31, 55 (Tex.2000); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 762 (Tex.2003).

Whether damages for a taking are compensable under the constitution depends on the type of damage involved, and compensability is a question of law for the court, subject to *de novo* review. *County of Bexar v. Santikos*, 144 S.W.3d 455, 459 (Tex.2004); *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001).

### Inverse Condemnation

The State asserts that McCarley's claim for damages due to his alleged injury from the State's drainage system was an inverse condemnation claim and that such claim was not ripe for determination during the statutory condemnation case because the highway project was still under construction, no site development permit had been denied, and no flooding had occurred on the remaining property. The State also argues that McCarley did not plead or prove the requisite intent and that McCarley lacks a justiciable interest because he sold the property. The State contends that although a claim concerning the drainage system may be actionable at some point in the future, the claim can be brought only in inverse condemnation because it relates to the "anticipated effect of drainage improvements being constructed by [the State] in its existing right-of-way, and does not relate to the use of the 836 square feet being acquired." The State argues McCarley's claim is inverse because the State did not seek as part of its statutory condemnation to inundate McCarley's remainder with stormwater runoff from its drainage system.

"When the government takes private property without first paying for it, the owner may recover damages for inverse condemnation." *Gragg*, 151 S.W.3d at 554. To recover on an inverse condemnation claim, a plaintiff must plead and prove an intentional governmental action, resulting in a taking, damage or destruction of property, for public use without process or a proper condemnation proceeding. *See* Tex. Const. art. I, § 17; *General Servs. Comm'n v. Little–Tex. Insulation Co.*, 39 S.W.3d 591, 598 (Tex.2001); *City of Houston v. Texan Land & Cattle Co.*, 138 S.W.3d 382, 387–88 (Tex.App.-Houston [14th Dist.] 2004, no pet.).

Although McCarley could have brought an inverse condemnation action had there been no partial taking, a further proceeding was not appropriate or necessary in light of the already pending condemnation proceeding. *See Westgate, Ltd. v. State*, 843 S.W.2d 448, 452 (Tex.1992) (inverse claim and statutory condemnation claim addressed in same proceeding); *State v. Fiesta Mart, Inc.*, 233 S.W.3d 50, 56–57 (Tex.App.-Houston [14th Dist.] 2007, no pet.) (court had subject matter jurisdiction to hear both State's statutory condemnation claim and leaseholder's inverse condemnation counterclaims for damage to personal property and business loss caused by impaired access); *Texan Land & Cattle Co.*, 138 S.W.3d at 386–88 (damages awarded for inverse claim for blocking access to property prior to condemnation and statutory claim for fair market value of property in same proceeding); *City of Austin v. Casiraghi*, 656 S.W.2d 576, 579–80 (Tex.App.-Austin 1983, no writ) (damages for loss of business brought in separate cause of action for inverse condemnation not allowed because not plead in statutory condemnation action); *cf. Dahl v. State*, 92 S.W.3d 856, 863 (Tex.App.-Houston [14th Dist.] 2002, no pet.) (inverse condemnation claims "duplicative" of State's condemnation action do not comprise valid inverse claims).

The trial court properly allowed McCarley as the landowner to recover all of the

damages to his property in a single action. *See White v. Natural Gas Pipeline Co.*, 444 S.W.2d 298, 301 (Tex.1969) (landowner "not to be burdened with the delay and expense of future lawsuits"); *City of La Grange v. Pieratt*, 142 Tex. 23, 175 S.W.2d 243, 246 (1943) (landowner must raise all reasonably foreseeable claims in statutory condemnation proceeding); *Casiraghi*, 656 S.W.2d at 579 (property owner given "single opportunity" to recover for the taking of property).[2] Because McCarley was aware of the injury to his property from the drainage system, whether his claim was "inverse" or not, he properly brought it in the statutory condemnation proceeding. *See Spindor v. Lo–Vaca Gathering Co.*, 529 S.W.2d 63, 65–66 (Tex.1975) (recovery may be had in condemnation proceedings for injuries to the remainder which are reasonably foreseeable at the time of condemnation); *Pieratt*, 175 S.W.2d at 246 (if reasonably foreseeable claims are not brought, they may be forever barred).

### 1. Was McCarley's claim ripe?

The State argues that McCarley's claim concerning the State's drainage system was not ripe because the highway project was still ongoing, there had been no flooding on his property, and there had been no permit denial at the time of the statutory condemnation. In support of its argument that McCarley's claim was not ripe because the highway project had not been completed, the State cites *Hubler v. City of Corpus Christi*, 564 S.W.2d 816 (Tex. Civ.App.-Corpus Christi 1978, writ ref'd n.r.e.). In *Hubler*, the court dismissed the plaintiff's inverse condemnation claim because the governmental drainage plan at issue was a series of projects and not all of the projects were completed, and the plaintiff did not claim that his land's value had been decreased by the completed projects but that the land value would be decreased at the conclusion of the series of projects. *Id.* at 821–24. The court concluded that the plaintiff's evidence of a decrease in market value was "too remote and speculative." *Id.* at 822. Unlike *Hubler*, there was evidence in this case that the market value of McCarley's remainder had decreased at the time of the statutory condemnation proceeding and that the decrease was caused by the substantially complete drainage system. *See id.* at 822.[3] The drainage system's status of construction did not prevent McCarley's claim from being ripe.

The State cites *State v. Malone*, 168 S.W.2d 292, 298 (Tex.Civ.App.-Austin 1943, writ ref'd w.o.m.), to support its position

---

**2.** Because McCarley's claims concerning the drainage system in the statutory proceeding were known to him, he had a duty to bring those claims in the condemnation proceeding or risk losing them. *See City of LaGrange v. Pieratt*, 142 Tex. 23, 175 S.W.2d 243, 246 (1943). In *Pieratt*, the supreme court held that when a tract of land is condemned for roadway purposes and an owner claims consequential damages to the remainder, all claims must be presented that could reasonably have been foreseen and determined at the time, or they would be subsequently barred. *Id.* After the condemnation action for a partial taking of his land had already concluded, Pieratt brought a separate suit seeking lost profits in his business during construction of the improvements to the street. *Id.* at 244–45. Pieratt argued that his claim for lost profit damages was uncertain at the time of the condemnation action. *Id.* at 246. In barring his subsequent suit, the supreme court stated that, in the condemnation context, a plaintiff's damages for reasonably foreseen claims must only "be ascertained with a reasonable degree of certainty," and the requirement is not that the damages be "certainly or definitely proved." *Id.* at 246–47.

**3.** The evidence showed that the drainage system's design was complete "for all intents and purposes" and that construction was substantially complete.

that McCarley's claim was not ripe because there had been no flooding on his property. In *Malone*, the State constructed a highway entirely in its own right-of-way and did not acquire any portion of the plaintiff's land for the highway's construction. *Id.* at 294. The plaintiff purchased the land after the project was completed and sought damages to his crops and soil when his property flooded as a result of the highway's construction. *Id.* at 298. Unlike the landowner in *Malone*, McCarley did not seek damages to his property from flooding. McCarley sought damages because the drainage system precluded his remaining property from being developed. Given McCarley's claim was that he could not develop his property, actual flooding was not required for McCarley's claim to be ripe. *See Spindor*, 529 S.W.2d at 65–66.

The State also relies on *Coble v. City of Mansfield*, 134 S.W.3d 449, 458–59 (Tex. App.-Fort Worth 2004, no pet.), in support of its argument that McCarley's claim was not ripe because no permit had been denied on McCarley's property. In *Coble*, the landowner was denied damages for the estimated cost of compliance with a subdivision ordinance (the cost of required improvements) as part of his remainder damages in a partial takings case. *Id.* at 451. The court concluded that the landowner's inverse condemnation claim was not ripe because the city had not made a final decision on the ordinance's applicability and the landowner had not shown that it would have been futile to seek a final decision. *Id.* at 458–59. The court concluded that the damages for the cost of compliance were "not reasonably foreseeable" but "remote, speculative, and conjecture." *Id.* at 456. There was evidence

that the ordinance might not be applicable and that, even if it was, the landowner might be granted a variance so that the improvements would not be required. *Id.* at 456–57.

In contrast, the evidence as to McCarley's remaining land was that the State's drainage system prevented the remainder property from being permitted for development under the City's requirements. Unlike *Coble*, there was no evidence that the City's requirements might not apply to McCarley's remaining land after the taking or that a variance might be granted.[4] On this record, I would conclude that McCarley's claim was ripe for determination in the statutory proceeding.

*2. Did McCarley establish the requisite intent?*

The State also argues that the State has sovereign immunity from McCarley's claim because McCarley failed to establish the requisite intent. The requisite intent for a takings claim is present when the governmental entity knows that a specific act is causing identifiable harm or knows that the harm is substantially certain to result from an authorized governmental action. *See Gragg*, 151 S.W.3d at 555; *City of Dallas v. Jennings*, 142 S.W.3d 310, 314 (Tex.2004). McCarley presented expert testimony that the loss in value in the remainder property was the result of the State's drainage system "as intended." *See Gragg*, 151 S.W.3d at 555 (court draws distinction between design and operation "as intended" and negligence).

There was evidence that the State designed the drainage system knowing that stormwater would back up on McCarley's property. In addition to the evidence that the State designed and constructed the

4. There was evidence that resubmission of the 1998 site plan would have been futile. McCarley's land planner testified that there

was nothing that McCarley could do to comply with the City's requirement or to obtain a site permit for development.

drainage system for a 10–year storm event and the City of Austin requires landowners to develop their land to accommodate a 100–year storm event, there was evidence that the State designed and built a retaining wall to divert water flowing from McCarley's property away from a nearby school. Although the engineer for the State testified that the wall that was built at the school's property line was a "noise wall," the State's plans referred to it as a "retaining wall." McCarley presented evidence that stormwater from his property would flow toward the school's property, and that the wall at the school's property line was designed to function as a retaining wall to divert water from McCarley's property from flowing on school property during storm events. McCarley's evidence was sufficient to satisfy the requisite intent.

*3. Did McCarley have a justiciable interest in his claim?*

The State argues that because McCarley sold the remaining property in February 2006, he lacks a justiciable interest in his claim. But McCarley owned the property at the determinative time, i.e., at the time of the taking. *See City of Fort Worth v. Corbin,* 504 S.W.2d 828, 830 (Tex.1974). McCarley was required to present all of his claims for damages that were reasonably foreseeable from the taking. *See Pieratt,* 175 S.W.2d at 246. He, therefore, properly sought his accrued damages due to the drainage system's effect on his remaining property's value. McCarley had a justiciable interest in his claim arising from the drainage system.

I would overrule the State's issues on inverse condemnation.

**Statutory Condemnation Award**

The State does not contend on appeal that the question to the jury was an incorrect statement of the law, but argues that there was no competent evidence or, alternatively, insufficient evidence to support the jury's finding that the difference in value of the whole property before the taking and the remaining property after the taking was $371,000. The State contends that the jury's award was improper because evidence of the drainage system's effect on the remaining property's value was incompetent evidence and, because it was the only evidence tendered by McCarley supporting the remainder damages, there was no evidence to support the award. The State argues that the determination of any decreased value should have been limited to the effect of McCarley's loss of the "corner clip" and not the effect of the highway project's drainage system on his remaining property. The State draws a distinction between the alleged damages from the drainage system in its "existing right-of-way" and any damages from the "taking of [the] corner clip." The State argues that it is entitled to judgment based on the only competent testimony of condemnation damages, the value of the part taken as testified to by the State's witness. This issue goes to the compensability of McCarley's damage claim arising from the drainage system, which we review *de novo. Santikos,* 144 S.W.3d at 459; *Interstate Northborough,* 66 S.W.3d at 220.

*1. Compensability of McCarley's claim*

In a statutory partial takings case, the property code provides for condemnation damages as follows:

> If a portion of a tract or parcel of real property is condemned, the special commissioners shall determine the damage to the property owner after estimating the extent of the injury and benefit to the property owner, including the effect of the condemnation on the value of the property owner's remaining property.

Tex. Prop.Code Ann. § 21.042(c) (West 2000). Section 21.042 "allows recovery only for the effects of the State's use of the condemned land," which differs from the State's "new use of its existing right-of-way or adjoining land." *Interstate Northborough,* 66 S.W.3d at 219; *State v. Schmidt,* 867 S.W.2d 769, 777–78 (Tex. 1993). The applicable statute also limits compensable damages in a partial takings action by prohibiting recovery for "community damages." Tex. Prop.Code Ann. § 21.042(d).[5]

Consistent with the county court's charge to the jury, statutory condemnation damages to the remainder are calculated by ascertaining the difference between the market value of the remainder immediately before and after the condemnation, taking into consideration the nature of any improvements and the use of the land taken. *See Interstate Northborough,* 66 S.W.3d at 218; *State v. Carpenter,* 126 Tex. 604, 89 S.W.2d 194, 197 (1936); *see also* 4A–14 Julius L. Sackman, *Nichols on Eminent Domain* § 14.01 (3d ed.2006).[6]

Market value is defined as "the price which the property would bring when it is offered for sale by one who desires, but is not obligated to sell, and is bought by one who is under no necessity of buying it." *Carpenter,* 89 S.W.2d at 202. The "willing-seller willing-buyer" test of market value considers the factors "which would reasonably be given weight in negotiations between a seller and a buyer." *City of Pearland v. Alexander,* 483 S.W.2d 244, 247 (Tex.1972) (citing *City of Austin v. Cannizzo,* 153 Tex. 324, 267 S.W.2d 808 (1954)).[7] Evidence of the factors that "increase or diminish the present market value" is admissible, not as a measure of damages or as a specific item of damage, but to allow the jury to arrive at the correct measure, the "lessened value of the tract." *Carpenter,* 89 S.W.2d at 199–200; *see also City of Sugar Land v. Home & Hearth Sugarland, L.P.,* 215 S.W.3d 503, 512 (Tex.App.-Eastland 2007, pet. denied) (testimony admissible on factors that a "willing buyer" would consider); 7A–G12 Patrick J. Rohan et al., *Nichols on Emi-*

---

**5.** Section 21.042(d) prevents recovery for community damages:

> In estimating injury or benefit under Subsection (c), the special commissioners shall consider an injury or benefit that is peculiar to the property owner and that relates to the property owner's ownership, use, or enjoyment of the particular parcel of real property, but they may not consider an injury or benefit that the property owner experiences in common with the general community.

Tex. Prop.Code Ann. § 21.042(d) (West 2000).

**6.** The State asserts that none of the drainage improvements that form the basis of McCarley's claim are within the 836 square feet that the State condemned and, therefore, any injury from the drainage system was incompetent evidence in the statutory condemnation proceeding. But there was evidence that the State's design included drainage improvements within the 836 square feet. There was evidence that a drainage pipe and approach

ditch to the pipe were within the 836 square feet, that "concrete riprap" was to be built on the condemned portion to prevent erosion, and that the condemned property was to provide an embankment area that would back up water on McCarley's remaining property. In any event, even if the evidence was limited to the State's uses of the 836 square feet, one use was for drainage.

**7.** The measure of McCarley's damages is the same whether his claim is classified as an inverse condemnation claim or as part of the statutory condemnation award. *See State v. Schmidt,* 867 S.W.2d 769, 775–76 (Tex.1993) (rules of recovery generally are the same for inverse and statutory condemnation awards). It is the diminution in value to McCarley's remainder property due to the State's taking under either theory of recovery. *See Tarrant Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, 557–58 (Tex.2004) (diminution in value one measure of damages in inverse condemnation).

*nent Domain* § G12.03 (3d ed.2007) (evidence admissible to show elements of damage that will cause a present diminution in market value of remainder). Admissible evidence includes reasonably foreseeable and probable uses of the affected property. *See Alexander,* 483 S.W.2d at 249; *Cannizzo,* 267 S.W.2d at 815; 4–12B Julius L. Sackman, *Nichols on Eminent Domain* § 12B.12 (3d ed.2006). It also includes past and probable future injuries. *See Alexander,* 483 S.W.2d at 246–47 (damages include "present and prospective" damages that are the "natural, necessary or reasonable incident of the improvement").

The supreme court has addressed the recovery of damages for the diminution in value to the remaining property in partial takings, placing emphasis on the particular facts and injuries alleged in determining whether the landowner is entitled to compensable damages for a loss in value. *See Santikos,* 144 S.W.3d at 462–63; *Interstate Northborough,* 66 S.W.3d at 219; *State v. Heal,* 917 S.W.2d 6, 8 (Tex.1996); *Schmidt,* 867 S.W.2d at 777–79. In *Schmidt,* landowners sought damages for their remaining property's decrease in market value due to traffic diversion, more circuitous access, decreased visibility, and the inconvenience of the State's construction activities when a portion of their property was condemned as part of a highway project. 867 S.W.2d at 770. The supreme court held the remaining property's loss in value due to the owners' alleged injuries was not compensable because the diminution was the result of the State's use of its existing right-of-way, not from the partial taking, and the damages were community damages. *Id.* at 776–81. It was the community-wide change in the highway and not the loss of the strip of property that reduced the remaining property's value. *Id.* at 778–79, 781.

Several years later in *Heal,* the supreme court again disallowed property owners' recovery "for the diminution in value of their remaining property not directly attributable" to the partial taking in a condemnation case. 917 S.W.2d at 11. The court reversed the award of damages, disallowing the owners' claim for "noise damages and other damages incident to the overall effect" of the highway project. *Id.* The court held the owners were "not entitled to compensation even if the remainder of their property has lost some degree of value." *Id.* ·

More recently, the supreme court allowed damages for the property's loss in value in a condemnation suit in which the State was acquiring a partial strip of commercial property to widen a highway and its frontage road. *Interstate Northborough,* 66 S.W.3d at 217. The landowner sought diminution in value damages to the remaining property resulting from the increased proximity to the roadway, with "attendant loss of curb appeal, green space, and 'buffer zone.'" *Id.* The condemnation left the development on the property in violation of a deed restriction and a building setback ordinance. *Id.* at 222. The jury awarded damages for the "decrease in the remainder property's market value, as well as renovation costs to the remainder that the condemnation necessitated." *Id.* at 218. The supreme court upheld the jury award, distinguishing the type of damages that were disallowed in *Schmidt* from the "increased-proximity" damages that affected the "remainder property in a special and unique way." *Id.* at 221–22.

In another recent partial condemnation action, the supreme court, addressing recoverable damages, disallowed recovery for the loss in the remaining property's value when the county took 0.485 acres of land for constructing a frontage road on an

existing right-of-way. *Santikos*, 144 S.W.3d at 455, 462–63. The highway project was to raise the roadbed, and the condemned land was to serve as a sloping embankment. *Id.* at 458. The evidence was that the 27–acre tract of raw, unimproved land was in some places five to six feet below the existing highway before the project and that, after the project, the land would be ten to eleven feet below the existing highway's elevation in some places. *Id.* at 457–58. The experts for both sides agreed that the land's best use was as an investment "until population and traffic grew to support development for retail use." *Id.* at 458. The landowner sought damages for the "diminished market perception of the remainder," seeking compensation of "almost $1 million, based mostly on the cost to raise the 3.5–acre tract alongside the embankment." *Id.* at 462–63. The landowner did not claim that the project prevented him from developing his land.

The supreme court reversed the jury's award, holding injury from the change in the property's location to below the frontage road not compensable and that the jury should not have considered the elevation change to determine the amount of damages:

> From the proposition that landowners have no right to insist that their premises be visible, it follows that they have no right to insist that they remain at grade level.... We hold that any damages resulting from leaving unimproved, raw land in its natural state while raising or lowering an adjacent roadbed in hilly terrain are community in nature.

*Id.* at 463.

With these principles in mind, I would reject the State's argument that McCarley's damages are not compensable. McCarley's injury that forms the basis of his claim for diminution in value to his remaining property from the State's drainage system is comparable to the type of injury the land owners faced in *Interstate Northborough*, which injuries were found to be "special and unique." 66 S.W.3d at 222. The State agrees that the type of injury that McCarley alleges was not "community in nature," and there was no evidence that other properties faced the same type of injury from the State's drainage system. I would hold that McCarley's injury from the diminution in value of his property due to the drainage system was compensable, whether sought as an inverse condemnation claim or as part of the State's statutory claim.

### 2. Sufficiency of evidence at trial

Both the State's and McCarley's appraisers testified that the appraisal process for valuing vacant land includes determining the property's highest and best use, and that this determination is limited to "legally permissible" uses of the property.[8] McCarley's site permitting expert, an

---

8. To determine the highest and best use, the testimony was that an appraiser considers four components, "what's legally permissible, what's physically possible, what's financially feasible, and what's maximally productive." Evidence on development issues is admissible in takings cases as part of an expert's valuation determination and the expert's basis for the highest and best use of property without the necessity of obtaining a definitive decision from the governmental entity involved. *See City of Austin v. Cannizzo*, 153 Tex. 324, 267 S.W.2d 808, 815 (1954) (testimony of existence of zoning ordinance that prohibited prospective use admissible and "jury could weigh the effect of the restriction against the prospective use" in determining market value); *City of Sugar Land v. Home & Hearth Sugarland, L.P.*, 215 S.W.3d 503, 511–12 (Tex.App.-Eastland 2007, pet. denied); 7A–G12 Patrick J. Rohan et al., *Nichols on Eminent Domain* § G12.03 (2)(a) (3d ed.2007); *cf. City of Houston v. Kolb*, 982 S.W.2d 949, 952 (Tex. App.-Houston [14th Dist.] 1999, pet. denied) (regulatory takings claim requires final deci-

engineer with 30 years of experience, including site work for private and public works projects, was the only witness to testify as to the City of Austin's permit requirements for stormwater drainage and detention and how those requirements applied to McCarley's property. He testified that the State's drainage system precludes the property from obtaining a site development permit because the system was designed to accommodate only a 10–year storm event and the City of Austin requires a landowner to show that the property is able to receive and handle upstream flows from a 100–year storm event.[9]

The State did not present evidence to dispute McCarley's engineer's testimony on this issue. The State's engineer testified that he was not an expert on the City of Austin's requirements for development:

Q. You've never gone out and actually done a development for a landowner like Mr. McCarley.

A. No, sir. We never try and skimp and meet the bottom dollar; we just try and do the right thing.

Q. Yes, sir. You have never taken a development project through the City of Austin.

A. I have not.

Q. You don't have knowledge as to what the City of Austin requires?

A. I have some knowledge, but, no, I've never taken a project through.

The State also objected to McCarley questioning the State's engineer on "land planning issues" on the ground that the questioning was outside the engineer's area of expertise:

I'm objecting because this witness was offered as an expert as a witness on the design of the facilities of the highway facility. He's asking him about things having to do with Mr. McCarley's property that he was not involved in. So he's going outside of what he was offered as an expert on.

In sum, the evidence showed that the City of Austin's requirements precluded development of the remainder property.

McCarley's real estate appraiser testified that because the remaining property could not obtain a development permit, its use was comparable to a commercial site for outdoor vendor sales such as Christmas trees.[10] The State's real estate appraiser confirmed that when a vacant lot is being appraised in the "Austin/RoundRock market, entitlements are very important things that [appraisers] have to look at: zoning, platting, site plans, those kinds of things." Although he assumed for purposes of his appraisal that the remaining property could be permitted, he testified that the property's value would be adversely impacted if it could not get a site development permit:

---

sion regarding the application of the regulation to the property at issue or showing that futility exception applies).

9. The State's motion to exclude McCarley's evidence did not seek to exclude McCarley's experts on the basis of relevance, reliability, or qualifications. See Tex.R. Civ. P. 702. The State's motion was based on the same issues that have been raised on appeal concerning McCarley's inverse condemnation claim—ripeness, requisite intent, and justiciability.

10. The parties disputed which properties were included in the condemnation proceeding. McCarley's experts included both Lot 1 and Lot 2 in their valuation determinations, and the State's experts only included Lot 1. There was evidence supporting a damage award based on both lots. See State v. Windham, 837 S.W.2d 73, 77 (Tex.1992) (landowner ordinarily has right to damages to the "entire remainder provided it is contiguous and there is unity of use").

Q. What we're really concerned about in the regulatory climate of the City of Austin is whether we can get a site development permit for the property, right?

A. For the remainder, sure. Well, and the whole, yes.

Q. Because if you can't get a site development permit, you can't develop any permanent improvements on the property, right?

A. True.

Q. And [Lots 1 and 2 are] not worth very much if you can't get a site development permit, are they?

A. That's true.

* * *

Q. You do agree that that's the key inquiry is whether or not you could get a permit from the City?

A. It would be—The presumption of my remainder appraisal is that you could.

Q. And you went through the four steps of highest and best use. If you can't get it legally permitted, you can't build it, and it's not the highest and best use, right?

A. True.

The trial court instructed the jury to consider the highest and best use. The jury properly considered the evidence of probable uses that would be legally permissible before and after the taking in deciding the ultimate issue of market value. *See State v. Windham,* 837 S.W.2d 73, 77 (Tex.1992). Based on the evidence, the jury could have reasonably decided that the highest and best use for the property prior to the taking was commercial development, that the highest and best use after the taking was "outdoor vendor sales," and that the remaining property's value had been significantly decreased by the State's condemnation and drainage system. It was within the jury's province to resolve the conflicting evidence on value in McCarley's favor and to disregard the State's argument that there was no diminution in value to the remaining property from the condemnation. I would conclude the jury's award was within the range of the evidence and that the evidence was competent and sufficient. For these reasons, I concur in the majority's decision to affirm the judgment of the county court.